New Orleans, Jackson, and Great Northern R. R. Co. *v.* Bailey.

40 395<br>72 199

# New Orleans, Jackson, and Great Northern Railroad Company *v.* William S. Bailey.

1. PRINCIPAL AND AGENT: EXEMPLARY DAMAGES: PRINCIPAL LIABLE IN EXEMPLARY DAMAGES FOR ACTS OF AGENT.—The principal is civilly liable for the acts of his agent, whether negligent or wilful, done in his employment, to the same extent, as if the principal were the actual wrong-doer.

2. PRINCIPAL AND AGENT: RAILROAD COMPANIES: RESPONSIBLE IN EXEMPLARY DAMAGES FOR ACTS OF AGENT AND EMPLOYEES: CASE IN JUDGMENT.—Railroad companies are responsible in exemplary damages for the negligent and wrongful acts of their agents and employees. Defendant in error sued plaintiff to recover damages for injuries done him by the neglect of one of the employees of plaintiff. The court instructed the jury, that they might find punitive damages, to operate by way of example, and to deter others from similar acts of violence and oppression. Held—That the instruction was proper. •

3. RAILROAD COMPANIES: RESPONSIBILITY TO PASSENGERS AND THIRD PERSONS.— Railroad companies, as to those persons to whom they place themselves under obligation by contract as passengers and others, are held to the exercise of the greatest possible care and diligence; as to third persons, to whom the company is under no special obligation of extreme diligence, they are only responsible for the want of ordinary care and skill.

4. RAILROAD COMPANIES: WHEN RESPONSIBLE TO THIRD PERSONS FOR THE SLIGHTEST NEGLECT.—Railroad companies are liable to third persons for the slightest neglect, where the party injured had not equal means with the company to avoid the accident, or where the company at the time of the injury, or its agents, were not engaged in a lawful employment.

5. SAME: CASE IN JUDGMENT.—Defendant in error, by contract with the Central Railroad Company, had the right to use a certain portion of the side track for the purpose of loading and unloading freight. Plaintiffs had the right to use the same side track, *when nothing was in the way*. While defendant was engaged in unloading cars on this side track, a train of cars of plaintiffs in error, and in charge of one of their employees, came in collision with the car upon which defendant was standing, and seriously injured him. Held—That plaintiffs were liable in damages for the injury, though the employee may have given the usual signals, that he was about to move a train of cars upon the side track.

ERROR to Circuit Court of Madison county. Hon. E. S. Henry, judge.

Plaintiff in court below instituted his suit, on the 19th of March, 1860, to recover $50,000 damages, for injuries done him by the negligence of an employee of defendants, on the night of the 22d November, 1859.

The declaration alleges, that plaintiff had the use of a side track built by the Mississippi Central Railroad Co., near their junction with the road of defendants. That he had the use of this side track by an agreement with the Mississippi Central Railroad Co., as a warehouseman, weigher and shipper of cotton, for the purpose of loading and unloading cars with cotton. That, while engaged in his business, and standing on one of the cars, superintending the loading thereof, the defendants, by the misconduct and negligence of their agents and employees, did violently propel a locomotive, the property of defendants, against the car on which plaintiff was standing, by means whereof he was thrown backwards, fell between two cars, was seriously injured, made to suffer great pain for three months, and to expend large sums of money, and prevented from attending to his business.

Defendants, after return of summons properly executed, appeared and pleaded a " general denial " of the allegations of the declaration.

Testimony for plaintiff in court below.

William S. Bailey testified that—He was the owner of a warehouse near the passenger depôt of defendants at Canton, Miss. The warehouse was west of the track of the Central Railroad. That in front of his warehouse, the Central Railroad Co. had built a side track. That, by an agreement with the Central Railroad Co., he was to have the free use of this side track in the prosecution of his business as a weigher and shipper of cotton and other produce, and that in consideration of this privilege the Central Road was to have use of his warehouse for certain purposes. That this agreement was in full force on the night of the 22d of November, 1859.

That, on the night of the 22d November, 1859, he was engaged on this siding in loading cars with cotton to be shipped by defendant's road. That he loaded the car opposite the warehouse, and had it pushed south towards the switch, and a step or two from the platform. That a second car was brought down to the warehouse, and detached from the car just loaded. That

he was standing on the car, superintending the loading thereof, with a lantern in his hand. While thus engaged, a violent shock from behind, and from the direction of the loaded car, was given to the car upon which he was standing. That he fell back, was thrown down between the car he was loading and the loaded one, and was thus greatly injured. That he was insensible, and crawled out, and was assisted by Mr. Landers. Sent to see what engine had caused the collision.

That at the time of the collision he heard no ringing of bells, nor noise of engines on the side track. That if he had heard any signal of an approaching train, he would not have supposed it to have been on the track where he was loading the car, as he had no reason to expect an engine on that track at night. He saw no signals or lights on the side track.

That by his contract with the Central Road, no one had any right on that siding when he was using it.

That between his loaded car and the switch, there was room enough for an engine and tender to come up and stand without striking or touching the loaded car. That there was a spur-siding of the defendants' road outside of the Central track, and it was on this spur-siding that the New Orleans train arrived and departed from their depôt, and there was plenty of room on this siding for an engine and tender to pass up and stand when the New Orleans train should come up.

That it was his habit to load the cars at night. Defendants sent their engines to the siding near his warehouse in the morning, and hitched on the loaded cars. That at the time the accident happened he had no reason to expect an engine on that portion of the track.

That when the accident happened the New Orleans down-train had started; the up-train had not arrived; they passed each other at Calhoun or Tugaloo.

That he was carried home that night, was confined to his bed for two months and a half, did not sleep for several days, never walks now without great pain, and is permanently disabled.

Cason testified that—He resides at Durant; was at Canton depot at time of accident, waiting for arrival of New Orleans day train. New Orleans night train had left. Heard collision, went and saw a man getting from under the cars; found that it was plaintiff.

Frost, superintendent of Central Road, testified that—The contract between the Central Road and Bailey, was as stated by Bailey. Don't know whether defendants knew of it. Both railroads use as a matter of courtesy the tracks and sidings of the other, when nothing in the way. But he believed the company so using the other tracks would be responsible for any damage resulting from such use.

Putnam testified—Heard collision; found plaintiff hurt; went to see what engine had caused the collision. It was an engine of defendants, in charge of engineer Hewston. That there was room enough on the siding for engine and tender without touching the car loaded by Bailey.

Landers testified, in substance, as Putnam and Bailey.

Kirby testified that—He was conductor on Central Road. Came down evening of accident at 5 o'clock P. M. Took cars loaded with cotton to lower siding of Central Railroad. Took my engine down to New Orleans turn-table, and came up behind the engine and tender in charge of Hewston. Saw an extra water-tank attached to his engine and tender. Hewston passed out of my way with his engine and tender on Bailey's siding.

Dr. McKie testified as to the nature of Bailey's injuries, and that he was permanently disabled.

Hall testified that accident occurred at a busy time, and that Bailey, from the accident, must have lost three or four thousand dollars.

Plaintiff read the acts of incorporation of defendants, and rested.

Testimony for defendants.

Hewston testified that he was switchman for the New Orleans, Jackson, and Great Southern Railroad, at Canton. His duties were to take charge of engines and trains on their arrival at Canton, to turn the engines, and remove them from

the main track. On the night of the alleged accident to Bailey, he took the engine, tender, and extra water-tank of the freight train to the " turn-table," turned them and backed them up to the switch; arriving there, found the sidings of the New Orleans road and of the Central road full of cars, and upper siding of New Orleans road occupied by night passenger train, and on the track of the Mississippi Central road, a freight train going down to " turn-table." He again ran his engine, tender, and extra water-tank below " turn-table," and let the engine of the Mississippi Central train on the " turn-table," and then returned to the switch, the engine of the Mississippi Central Road following him up. On his return to the switch, found them occupied as stated: the Mississippi Central train on their track, and the New Orleans night passenger train giving signals to move southward. The switchman moved the switch so that he could move on Bailey's siding. Some loaded cars on the siding in front of Bailey's warehouse. Saw these cars, but believed there was room sufficient to stand on the track below them. Ordered two of his brakesmen on his train to go to the rear of the water-tanks, with lanterns, and signal when to stop. Commenced to back his train, and ordered the firemen to ring the bell and watch on one side of the train for the signal of the brakesman, while he kept a lookout on the other. He continued to back the train until signalled to stop, and backed no farther than was necessary to get out of the way of the switch, and stopped as soon as signalled. Backed up very slowly, and on examining steam-gauge when he stopped, found there was only twenty pounds of steam on the engine as indicated by the gauge and card attached. In moving on the siding the water-tank struck a detached car. The stroke sent this car against those on which Bailey was alleged to have been standing. The stroke was not sufficient to have started the cars on the siding if they had not been detached. The brakesmen were on the siding, near where Bailey, was alleged to have been standing, and signalled him that all was clear, and to move up. He was told by Bailey when the accident happened, he was standing on the cotton bales, with one foot on the

near bale on one car and the other on the front bale on the other, and that when the cars were struck they separated and he fell between them, and that the cars were not coupled together. That he had moved train of cars frequently on Bailey's siding, with the knowledge and in the presence of Bailey and the agents of the Central Road, and had never been told to cease the same until some time after the accident, when he was told by Superintendent Frost to stop. That a day or two before this accident, in moving Central cars on Bailey's siding, a detached car was struck, and pushed another car on which were two negroes at work, and both were thrown down violently. That this accident was witnessed by Bailey, who was talking to witness at time of occurrence.

Otto testified that—He was depôt clerk of defendants at Canton. Knew Hewston well; that he was faithful, attentive, and skilful; as much so as any agent in the company's employ. That the two roads, Mississippi Central and N. O. G. N. R. R., used the tracks and sidings of each other, and it was necessary for the amount of business then on hand.

Don't know whether Hewston had been discharged. His duties were as stated by him. Was always sent up with engines to take off cars in front of Bailey's warehouse. It was Hewston's duty to keep the main track clear. On 22d of November, 1859, New Orleans down-train left Canton at 6.30 p.m., and up-train arrived at 7 p.m.

Defendants offered to prove the character of Hewston for veracity by this witness and Bruner. Objected to, and objection sustained.

Bruner testified, that each of the two roads used the track and sidings of the other without objection.

Had been an engineer eight years. If Hewston did as he said, he backed on the siding with all the care and caution that a prudent man could. An engine cannot always be backed up to a train without some shock.

Has seen Hewston sometimes take a drink; saw him once when he drank, but he had nothing to do. Never saw him drinking when he had anything to do.

Frost testified that—On the 22d November, 1859, the night train from New Orleans came up every morning on the siding nearest Bailey's warehouse, and were put away at an early hour in the morning, so as not to interfere with business of Bailey.

James Wales testified that—He was at Bailey's warehouse on the evening of 22d November, 1859; saw Bailey; talked with him; thought he was drinking. He seemed much confused; might have been from fatigue. Had not seen Bailey drink that day.

Defendants introduced two almanacs, which stated that the sun set on 22d November, 1859, at forty-five minutes after four o'clock.

This was all the testimony for defendants.

Plaintiff introduced the following testimony:

William S. Bailey.—That he had never had a conversation with Hewston about the accident. He was standing at the time full length of a bale of cotton from end of car. Heard no bell; saw no lights. The shock was very violent; thinks it would have moved the cars if they had been attached. He was not drinking; not at all under the influence of liquor.

That he had occasional conversations with Hewston, after the accident happened.

Landers.—That Bailey was in his usual condition, at time of accident; had not been drinking.

Gough.—That Hewston left his house where he was boarding, on the 6th of April, 1860, went to New Orleans, returned in a few days, and then left permanently.

Defendants paid off their employees at New Orleans.

The court instructed the jury as follows for the plaintiff:

The substance of the first and second charges will be found in the opinion of the court.

Third Charge.—The defendants are responsible for the tortious acts of their agents, whether of omission or commission, whether negligent, fraudulent, or deceitful, and for the consequences of their neglect of duty.

Tenth Charge.—If the jury believe from the evidence, that

26

Bailey had a contract with the Mississippi Central Road, by which he had the right to the free use and enjoyment of their sidings opposite his warehouse; and if they believe that Bailey, on the night of the 22d of November, 1859, was engaged on said siding in his ordinary avocation and business, in pursuance of his contract with the Central Road; and if they believe that Hewston was at the time a switchman in the employ of defendants, and that on said night he run one of the defendants' engines on said siding without authority, and occasioned the accident, while Bailey was engaged on said siding, the defendant is responsible, and the jury will so find, provided he had authority, and did not use proper caution.

The charges asked by defendant were all given.

The jury returned a verdict for plaintiff, and assessed his damages at $12,000.

A motion for a new trial made :

1. Because the verdict is against the law and evidence.

2. Because the court erred in giving the instructions asked by plaintiff.

The motion was overruled, and a writ of error sued out.

*William* and *James R. Yerger*, for plaintiffs in error.

This action was brought by Bailey, to recover damages from the plaintiffs in error, for the alleged misconduct and negligence of their engineer, in so negligently and carelessly managing a locomotive belonging to them, that the defendant in error received serious bodily injuries, and sustained heavy pecuniary loss.   There is no charge against plaintiffs in error of any negligence or misconduct on their own part, or that they knew beforehand, or afterwards ratified and approved the act of their agent.

The facts in the case are substantially as follows :

Bailey was engaged as a shipping and forwarding merchant at Canton.  He had built a cotton shed near a side track belonging to the Mississippi Central Railroad; and in consideration of permitting the Central Railroad to use this cotton shed for storage of freight, the Central Railroad permitted Bailey to

bring the cars of the New Orleans Railroad upon the side track, and load them with cotton from his warehouse, for shipment to New Orleans. The New Orleans Railroad and the Central Railroad had a mutual arrangement, by which the side tracks, turn-tables, and other conveniences, in the management of their business at Canton, were used indifferently, and for their mutual accommodation.

On the night of the 22d of November, 1859, the defendant Bailey was engaged, after dark, in loading some cars belonging to the New Orleans Railroad, with cotton. These cars were on the side track, before referred to; some were loaded and others were in the act of being loaded. Bailey stood on one of the loaded cars, giving directions to his servants, and while so engaged, a locomotive and tender, under the charge of Hewston, belonging to the New Orleans Railroad, moved upon the side track, and struck a detached car, backing it against the car on which Bailey was standing; by this he was thrown off, and received serious bodily injuries. Hewston moved the car on the side-track, in order to make way for an engine and cars belonging to the Central Railroad to move forward, after having used the turn-table belonging to the New Orleans Railroad.

Bailey testifies that, before the collision, he heard no signal, saw no lights, and did not know that any engine belonging to the New Orleans Railroad had come upon the side track. His back, however, was turned in the direction from which an engine on the New Orleans Road would have moved upon the side track, and he was also occupied in giving directions about loading the cotton. Hewston testifies, that it was his business to take charge of the engine and cars of the New Orleans trains, at Canton, to turn the engines, and remove them from the main track. That on the night of the accident, while engaged in this business, he backed the engine and tender upon the side track, in order to get out of the way of an engine belonging to the Central Railroad, which had been using the turn-table, and was on the main track of the New Orleans Railroad. That he saw some empty and some loaded cars on the side track, in front of Bailey's warehouse. That he did not know that any person

was on them, and believed there was sufficient space to back his engine and tender on the side track without striking the cars that were then on it. He ordered the brakesman to go to the rear with lanterns, and to signal when to stop; and as he commenced backing, he ordered the fireman on the engine to ring the bell, which he did. He also ordered the fireman to watch for the signal of the brakesman, on one side of the engine, and he watched for the signal on the other. He backed the engine slowly, going no further than necessary, to get out of the way of the switch, and stopped as soon as signals were made for that purpose. When he stopped he looked at the steam-gauge, and found there was only twenty pounds of steam on the engine. The engine struck a detached car, moving it against that on which Bailey was standing. The stroke was not sufficient to have started the cars, if they had not been detached. The brakesman signalled that all was clear, and shouted to witness to move up. The witness, both before and after the injury to Bailey, with the knowledge and in the presence of both Bailey and the agents of the Central Road, used the side track, without objection on the part of either, for the engines and cars of the New Orleans Road.

Bruner, a witness for the plaintiff in error, testifies that: each of the two roads were in the habit of using the tracks and sidings of the other without objection. Frost, a witness for defendant in error, and agent of the Central Road, proves the same facts. Bruner also proves that he had been a railroad engineer for eight years, and that if Hewston backed upon the side track, with the care and caution stated by him, he did all he could as a prudent man. An engine cannot always be backed up to a train without some sort of a shock, more or less, according to the practice of engineers, but it is possible to do so. On cross-examination, he stated that he had seen Hewston sometimes taking a drink. Saw him one night, at half-past eleven o'clock, when he thought him drunk; but he had nothing to do at that time; and witness never saw him drinking, when engaged in his usual business.

Otto, witness for plaintiff in error, and clerk at Canton depôt,

proves that he knows Hewston; and that he was faithful and attentive to business, as much so as any one in the employment of the company. There is no evidence whatever contradicting the statements of Hewston, as to the care and caution used by him in backing the engine, unless Bailey's negative testimony can be so considered. From that it appears that Bailey's back was turned to the engine; that he did not know it was moving up; and that he had his attention fixed entirely on the cars he was loading. His negative testimony is, therefore, of no value, against the direct testimony of Hewston. On these facts the jury found a verdict of $12,000 against plaintiffs in error. This verdict is without any evidence to support it, and never would have been rendered but for the erroneous rulings of the court.

It is evident, from the instructions given in behalf of defendants in error, that the court totally misconceived the liability of the railroad company, and treated it throughout as a wilful wrong-doer, or grossly negligent carrier of passengers, instead of being, as the record shows it to be, an innocent company, totally ignorant of the wrongful acts of its agent—if that agent were guilty of such acts; and without any neglect whatever, either in the management of the road, or the employment of the agent. The wrongful act complained of was not sustained by the defendant in error, as a passenger on the cars of the company; and the rigid rules applicable to railroad companies, as carriers of persons, were not justly applicable in this case. But the court misconceived the law in this particular, and did so apply them.

It is believed, that nearly every instruction given by the court for defendant in error, is unwarranted by the facts— that neither the duty of the railroad company, in relation to the defendant, nor the true principles of law applicable to the case, warranted the instructions. They are palpably erroneous, and could not be justified in any case, except in an action against the company as a carrier of passengers, or unless the company itself had been guilty of some wanton outrage or gross neglect of duty, to the prejudice of the defendant in error.

1. The first instruction given by the court is in the following language: "The court instructs the jury, that if they find for the plaintiff, they are not restricted in giving damages to the actual positive injury sustained by plaintiff; but may give damages as a punishment against the defendants; that not only may the plaintiff receive compensation for the injury inflicted upon him, but that the interest of society may be regarded, and such damages may be awarded as may tend to operate, by way of example, and to deter others from similar acts of violence and oppression, if any such acts were committed."

The doctrine of exemplary, or punitive, or vindictive damages, contained in the above instruction, has been the subject of much controversy. We believe that the true ruling, as established in a majority of the cases, may probably be found laid down by Sedgwick, in his work on Damages—at least this court has recognized the rule laid down by him. It is in the following language: "Whenever the elements of fraud, malice, gross negligence, or oppression, mingle in the controversy, the law, instead of adhering to the system, or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages — in other words, blends together the interest of society and of the aggrieved individual, and gives damages, not only to recompense the sufferer, but to punish the offender." Professor Greenleaf controverts this position, and insists that damages can only be given in a private suit, "as a compensation for some injury sustained."

If this were a new question, it would seem that the doctrine of Greenleaf would be most consistent with true principle and legal analogies. But a different rule has been so frequently laid down and acted upon, both by the English and American courts, that an attempt now to shake it would be an act of vain labor. But the rule should never be carried any further than the purpose for which it was originally established. It was intended to operate as a punishment upon great offenders, and by way of example, to deter others from the commission of like

offences. It was only applied to cases of great enormity, to cases of gross negligence, to cases of great violence, or of fraud or misconduct implying malice; and it is only applicable in actions against the actual wrong-doer.

If " fraud, malice, gross negligence, or oppression mingle in the controversy," let the party guilty of these acts be punished. But to extend the rule, as was done in the instruction given in this case, to an innocent employer, and to punish him for the misconduct or wrong committed by his agent, confounds every principle of law, subverts every correct theory of justice, and punishes the innocent for the guilty.

I admit that the railroad is liable to make compensatory damages for every injury by any of their agents or servants committed while in the employment and engaged in the business of the company. But no adjudicated case can be found, nor any well-considered dictum produced, which will hold the principal responsible, in vindictive or exemplary damages, for the misconduct of his agent, unless that misconduct was either approved or ratified by the principal, or had its origin in some wrongful act or negligence of the principal himself. To hold otherwise is to establish a more cruel and oppressive rule than the tyranny of Caligula conceived. He wrote his laws defining crimes, and hung them so high that the public could not ascertain what was criminal. We would go further—we would punish not only for the commission of an act which the party did not know to be criminal, but would punish the innocent for an act which he did not commit, which he did not approve, and which he could not prevent. Surely neither public policy nor protection of private right can in any case demand that a principal, guilty himself of no wrong, chargeable with no neglect, and ignorant of the purpose and intention of his agent to commit a wrong or neglect his duty, shall do more than make full compensation to the injured party for all the damages that he may have sustained, either in feeling, in person, in property, or estate. To that extent let the principal answer for the wrongful act of his agent; but to extend it further would, under the forms of the law, enable parties to commit greater wrongs and inflict

more wanton outrage than the wrongs which, in such case, the law would pretend to redress. This is essentially true of railroad corporations. Having a large amount of business to transact, they can only act through the medium of agents. Their engineers, their brakesmen, their conductors, their switch-tenders and other employees number during the year many hundreds. They must necessarily be men of very different capacities and character. That some of them will prove negligent and abuse their trusts is positively certain, for they are human. No sagacity, no prudence, no care in the selection, can enable the railroad companies to obtain agents who will not sometimes neglect their duty, unless the companies have the power to select from men of absolute perfection. To require them to do more than compensate for the wrongful acts of their agents, when in no fault themselves; to punish them for acts which their utmost prudence could not prevent, is to inflict punishment, not for their wrong or crime, but because of their inability to do an absolute impossibility—that is, to select from imperfect and careless humanity, absolutely perfect and careful agents. Such a rule would wither all public enterprise, would deter capitalists from investing their money in these necessary works of public improvement, and at the same time would encourage licentious and speculative litigation, destructive alike to the morals of society and the commercial prosperity of the State.

The rules of law applicable to the duty of railroads, as common carriers of passengers, seem to be well defined; having a due regard on the one hand to the lives and persons of passengers, and at the same time exacting no more from the railroads than a just and humane policy demands.

Common carriers of passengers are held responsible for the slightest negligence resulting in injury, or, in other words, are required, in the preparation and management of their means of conveyance, to exercise the highest degree of diligence and skill which a reasonable man would use under such circumstances. They are obliged by their contract to carry safely, as far as human care and foresight will reasonably admit; but an imprac-

ticable degree of skill and diligence is not required of them. It has been frequently ruled that the same degree of diligence and the same rules, which are applicable to the proprietors of stage-coaches, are applicable to railroad companies, whose vehicles are propelled by steam. The company is bound to provide skilful and careful servants, of good habits, and in every respect competent for the posts which they are appointed to fill, as conductors, engineers and brakesmen; and is responsible not only for their possession of such care and skill, but also for the continued application of these qualities, at all times. It is bound to use adequate skill and the utmost care and diligence in providing such cars, engines, boilers, and other machinery, as are safe and sufficient for the purposes for which they are used, and will be responsible for injuries to passengers which the exercise of such skill and diligence might have prevented. It does not, however, absolutely warrant their sufficiency. But where the accident arises from a hidden and internal defect, which a careful and thorough examination would not disclose, and which could not be guarded against by the exercise of a sound judgment and the most vigilant oversight, then the company is not liable for the injury. The company is bound to exercise the most exact diligence, not only in the management of the trains, but also in the structure and supervision of its road, and in all the subsidiary arrangements which are necessary for the safety of passengers. It is under the same responsibility for the proper condition of its track as for the sufficiency of its machinery and the fidelity of its servants. Pierce on Railroad Law, 470, 471, 472 *et seq.*, and cases cited.

Such damages are to be assessed for torts of a railroad company as will compensate the injury. The same general principles determine the assessment of damages as in actions for like injuries against other corporations or private individuals. The plaintiff's business and the necessity of his personal attention to it—bodily pain, suffering, as well as loss of time and money, are proper matters for the consideration of the jury in assessing damages for a physical injury to a party. Pierce on Railroad Law, 254.

A railroad company is liable to an action for the tortious acts of its servants, while acting in the course of their employment, and within the powers conferred by the charter; and this, whether proceeding from negligence or being wilfully done, and directly contrary to instructions.    Pierce on Railroad Law, 232.

These rules would seem to be sufficiently rigid to compensate the citizen for every possible injury that he could sustain from the negligence or wilful wrongs of the company, its servants, or agents.    But where no wilful wrong, no malice, no intentional injury, no gross neglect, can be predicated of any act done by the company; where they are not actual wrong-doers, but for reasons of public policy, are held liable to make compensation for the wrongful acts of their agents; and when they are absolutely compelled to transact their business by agents—it is difficult to conceive upon what principle of law, upon what principle of moral right, or of public policy, vindictive damages, or punitory judgments, can, in any case, be given against them—much less in a case where the record shows them to be without actual fault, and to have exercised all the skill and foresight in the selection of their agent, which reasonable men, similarly situated, would have brought to bear in their own affairs.

In reference to vindictive or exemplary damages, it has been held that the intention becomes material.    If the injury is not intentional, but results simply from a want of proper care, nothing more should be recovered than will compensate for the actual damage; but if the act is wilful or intentional, then "the idea of compensation is abandoned, and that of punishment introduced.    And generally it will be found that malice must exist, to entitle a party to anything more than reparation for the injury.    Malice imports wilful and intentional wrong, and either that, or gross negligence, must supervene to entitle a party to anything more than compensatory damages, even in actions against the actual wrong-doer."    *Goetz* v. *Ambs*, 27 Missouri R. 28.

We have before stated, that Sedgwick declared the rule of

New Orleans, Jackson, and Great Northern R. R. Co. v. Bailey.

law to be: "That where gross fraud, malice or oppression appears, the jury are not bound to adhere to the strict law of compensation; but may by a severer verdict at once impose a punishment on the defendant, and hold up an example to the community." But while thus giving the general rule, he proceeds to state: "That the intention of the defendant is material in regard to damages, has always been recognized in our law. Damages are graduated by the intent of the party committing the wrong. The question of intention is only urged in mitigation or aggravation of damages." Sedgwick on Dam. side page 455.

So in the case of *James* v. *Payne*, 5 Car. & Payne, 372, it was held, that although the defendant was liable for an injury done by him, whether intentional or not, yet "the intention is material in considering the amount of damages."

So in New Hampshire, Judge Woodbury said: "In respect to the intention, that is not in cases of this sort a subject of inquiry, except to prevent vindictive damages. The intent of the party may affect the damages, and, as the defendant appears not to have been actuated by any bad motive, nor to have used and converted the sleigh to his own use, he should pay only the actual injury, caused by the removal of the sleigh." *Sinclair* v. *Tarbox*, 2 N. H. R. 135. This was an action against the actual wrong-doer.

In tracing the doctrine of vindictive or exemplary damages, from its inception to the present time, it will be found, that in every case in which the courts have applied the rule, even against the actual wrong-doer, they have uniformly held that the intention is an essential ingredient, and enters materially into the question of damages; and that where there is an absence of intentional wrong, or where gross fraud, negligence, or malice does not appear, vindictive damages will not be given, even against the actual wrong-doer. See Sedgwick on Dam. 479, 480, 555 *et seq.*, 668, and cases cited.

In actions of tort, where there has been no wilful injury, the plaintiff can only recover the damages necessarily resulting from the act complained of, and he cannot conduct in such

a manner as to make the damages necessarily burdensome.    11 Barb. 368, 4 Calif. 297.    In all cases of tort, where no evil motive is charged, compensation is regulated by the direction of the court, and is a pure question of law.    Sedg. on Dam. 210, 211.    That is, compensation for the damages necessarily resulting from the act complained of is given.

How much more truly and justly is this rule applicable to parties, who are made responsible from motives of public policy without any criminal intent on their own part, for the wrongful acts of their servants and agents.

Accordingly, in well considered cases, when the question has come directly before the court, it has been uniformly held that the full measure of damages is the value of the property injured or destroyed, or of compensation for the wrong inflicted, without the idea of punishment entering into the question.    In the case of *Del. Col.* v. *Arnold,* 3 Dallas, 333, such was the adjudication by the Supreme Court of the United States.

In the case of the "Amiable Nancy," 3 Wheaton, 546, which was an action against the owners of a privateer for the misconduct of the captain and crew towards neutrals, the court uses the following clear and emphatic language :    "Upon the facts disclosed in the evidence, this must be pronounced a gross and wanton outrage, without any just provocation or excuse. Under such circumstances, the honor of the country and the duty of the court equally require, that a just compensation should be made to the unoffending neutrals, for all the injuries and losses actually sustained by them ; and if this were an action against the original wrong-doers, it might be proper to go yet further, and visit upon them, in the shape of exemplary damages, the proper punishment that belongs to such lawless misconduct.    But it is to be considered that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them ; and yet, from the nature of the service, they can scarcely ever be able to secure to themselves an adequate indemnity in cases of loss.    They are inno-

cent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it, in the slightest degree. Under such circumstances we are of opinion, that they are bound to repair all the real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages. While the government of the country shall choose to authorize the employment of privateers in its public wars, with the knowledge that such employment cannot be exempt from occasional irregularities and improper conduct, it cannot be the duty of courts of justice to defeat the policy of the government, by burdening the service with a responsibility beyond what justice requires—with a responsibility for unlimited damages, resting in mere discretion, and intended to punish offenders."

A similar question arose in the case of *Keen* v. *Lizardi et al.* volume 8, Cases Supreme Court La., o. e., page 26. This was an action brought to recover damages of defendant, for injuries to plaintiff's wife, at the hands of the master of a vessel, on which she was a passenger. The evidence showed gross neglect and wanton outrage on the part of the master against the lady; and in an action against him, any damages calculated to punish the wrong-doer, or to deter by example others similarly situated, would not have been deemed excessive. In delivering the opinion of the court, the judge said: " It is true, juries sometimes very properly give what is called 'smart money.' They are often warranted in giving vindictive damages, as a punishment inflicted for outrageous conduct. But this is only justifiable in an action against the *wrong-doer*, and not against persons who, on account of their relation to the offender, are only consequently liable for his acts, as the principal is liable for the acts of his factor or agent."

In *Morford* v. *Woodworth*, 7 Indiana, page 83, suit was brought against the principal, for injury resulting from the tortious act of workmen employed by him. The workmen left a cellar on which they were at work uncovered at night, and by means thereof, the defendant in error received injuries. The inferior court instructed the jury that they might give exem-

plary damages. In the appellate court the instruction was overruled, and the case reversed.

In the Supreme Court of California, this question has arisen in several cases. In *Wardrobe* v. *California Stage Company*, 7 California R. 118, an action was brought by Wardrobe to recover damages, for injuries sustained while a passenger in one of defendants' coaches. A verdict was rendered in the court below, and instructions similar in principle to the instructions given in the case now under consideration. "The jury found a verdict for actual and exemplary damages, in the sum of $2,500." The Chief-Justice, delivering the opinion of the court, quoted with approval the opinion of Judge Story in the "Amiable Nancy," and stated: "When it appears that the coach, at the time of the accident, was driven by a servant or agent of the owner, the rule in such cases is, that the principal is liable only for simple negligence, and that exemplary damages cannot be enforced against him.

In the case of *Moodey* v. *McDonald*, 4 Calif. 297, the facts were similar to the above, and in the action brought against the principal, for tortious acts of his servant, where the jury gave $2,500 damages, and $2,500 ' smart money,' the court disallowed the verdict for the smart money, holding the principal only liable for compensatory damages.

In Rhode Island this question also arose. In *Hogan* v. *Providence and Worcester Railroad Co.*, 3 Rhode Island R. 88, an action was brought to recover damages against the Railroad Company, for the tortious act of a servant.

The court below instructed the jury that punitive or vindictive damages, or 'smart money' were not to be allowed against the principal, unless the principal participated expressly in the wrongful act of the agent—or impliedly, by his conduct, authorized or approved it, either before or after it was committed. But held, that all damages for actual injury, loss of time, pain of body, money paid for employment of physician, or injury to the feelings of the defendant, might be allowed."

The Supreme Court, before whom the case was brought, ruled

this instruction to be correct, and Justice Bayton delivering the opinion of the court said: "We understand, however, that the evidence in the case was not such as to show any participation of the principal in the wrongful act of the agent; and that the jury were instructed that punitive or vindictive damages, or smart money, were not to be allowed as against the principal, unless the principal participated in the wrongful act of the agent, expressly or impliedly, by his conduct authorizing it or approving it, either before or after it was committed. And that they were instructed, that all damages for actual injury, loss of time, pain of body, money paid for employment of physician, or injury to the feelings of the defendant, might be allowed.

"We think the charge was right. Whatever may be the rule of damages, in cases of direct prosecution against the wrong-doer, we think there can be no doubt of the soundness of the ruling of the judge at the trial, as applicable to a case like the one in question, where a principal is sought to be made liable for the act of his servant or agent.

"In cases where punitive or exemplary damages have been assessed, it has been done upon evidence of such wilful reckless-ness or wickedness on the part of the party at fault, as amounted to criminality, which for the good of society, and warning to the individual, ought to be punished. If in such cases, or in any case of a civil nature, it is the policy of the law to visit upon the offender such exemplary damages as will operate as punishment, to teach the lesson of caution, to prevent a repetition of criminality; yet we do not see how such damages can be allowed, where the principal is prosecuted for the tortious act of his servant, unless there is proof in the cause, to implicate the principal, and make him *particeps criminis* of his agent's act. No man should be punished for that of which he is not guilty.

"Cases may arise, in which the conduct of the principal, in reference to the act of his agent, is such as to amount to a ratification. In all such cases, the principal is *particeps criminis*, if not the principal offender; and whatever damages might

properly be visited upon him who commits the act, might be very properly inflicted upon one who thus criminally participates in it.

"But where the proof does not implicate the principal, and however wicked the servant may have been, the principal neither expressly, or impliedly authorizes nor ratifies the act, and the criminality of it is as much against him as against any other member of society, we think it quite enough that he shall be liable in compensatory damage, for the injury sustained, in consequence of the wrongful act of a person acting as his servant."

In the case of *Hill* v. *the New Orleans and Opelousas Railroad Co.*, 11 Louisiana R., 292, the court used the following language : " In actions of this kind, it is not within the province of the jury, although the negligence is clearly proven, to give vindictive damages, as is sometimes allowed in cases of wilful or malicious injuries. It is true, that in estimating the damages, where a case is made out, the jury may consider the painful nature of the wound, as well as the length of time the plaintiff has been kept from his employment, and the permanent character of the injury sustained. But in assessing the damages, the jury should give such reasonable sum as will really compensate the plaintiff, and no more. The company in such case, is not to be punished for the negligence or carelessness of its agents, as a crime."

In the case of the *Philadelphia, Wilmington and Baltimore Railroad Co.* v. *Quigley*, 21 Howard's R. 213, an action was brought against the company, for an alleged libel published by the company. The court held that the action could be maintained. In the Circuit Court, an instruction on the subject of punitive damages was given in the following language : " And if the jury find for the plaintiff, under the instruction, they are not restricted in giving damages, to the actual positive injury sustained by the plaintiff, but may give such exemplary damages, if any, as in their opinion are called for and justified, in view of all the circumstances in this case,

to render reparation to plaintiff, and act. as an adequate punishment to the defendant."

The Supreme Court did not sustain this instruction, for the reason that the rule of damages was not stated accurately to the jury. It would have authorized a verdict for exemplary damages, without finding the libel "wanton or malicious."

In *Day* v. *Woodsworth*, 13 How. S. C. R. 371, that court recognized the power of a jury in certain actions of tort, to assess against the tortfeasor punitive or exemplary damages : "Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations. Nothing of this kind can be imputed to these defendants."

The foregoing are actions brought against a defendant for wrongs committed by a servant, and they all established the principle, which, so far as our examination has extended, seems to be universal; to wit, in all cases where, from the policy of the law, it becomes necessary or proper to fix liability upon the superior for the wrongful act of the agent, that liability will extend to full and absolute compensation for all damage of every kind that a party may sustain in person, character, or estate; yet in no case will the rule be extended, so as to fix upon an innocent principal punitory or exemplary damages, for an act over which he had no control, which was not the result either of intentional wrong, or a want of due care on his part, and of which he was ignorant before its commission, and did no act to ratify afterwards.

In the case of *Hardinge* v. *Green*, 3 English Com. Law R. 176, Chief-Justice Gibbs expressed the true rule of the common law, which is likewise the rule of common-sense and practical morality, in the following language : "There is a marked distinction, perfectly familiar to our law, and consistent with the

27

principles of all laws, between fixing persons with criminal and civil responsibility, by the acts or through the medium of others. The acts of the servant are only the acts of the master, *sub modo*, and the rule is narrower in actions of tort than in actions of contract."

A like distinction between a criminal and civil responsibility for the acts of a servant was declared by the House of Lords on the impeachment of Lord Melville. See 1 Phillips on Evidence, volume 1, page 10, 2 ed. 1839. On the impeachment in this case, a receipt was given in the regular and official form by Mr. Douglass, the attorney of Lord Melville, to transact the business of his office of treasurer of the navy, and to receive all necessary sums of money, and sign receipts for the same. The Lord Chancellor said : " The first steps in the proof of the charge must advance by evidence, applicable alike to civil and to criminal cases ; for a fact must be established by the same evidence, whether it is to be followed by a criminal or civil consequence ; but it is a totally different question, in the consideration of criminal justice as distinguished from civil, how the noble person now on trial may be affected by the fact, when so established. The receipt by the paymaster would, in itself, involve him civilly ; but could by no possibility convict him of a crime."

Again, the distinction between intentional injuries and the liability of parties for the same, and their liability for unintentional wrongs, is clearly taken in the case of *Krom* v. *Schoonmaker*, 3 Barbour's R. 647. That was an action of trespass against a lunatic. The court ruled, that a lunatic could not be punished for a crime, but might be held liable to the extent of the injury done, using the following language : " A lunatic is not a free agent, capable of intelligent, voluntary action, and therefore is incapable of a guilty intent, which is the very essence of crime ; but a civil action, to recover damages for an injury, may be maintained against him, because the intent with which the action is done is not material. But the principle upon which this distinction rests, reaches also to the measure of damages in a civil action. Ordinarily, in an action for a

personal injury, the amount of damages is, at least to a considerable extent, governed by the motive which influenced the party in committing the act. This is usual, and as proper as it is usual, for the court, upon the trial of an action for an assault and battery, to instruct the jury that the action is maintainable, even though the injury was accidental ; that if intentional, yet, when the act is done under the excitement of strong provocation, it is a proper ground for the mitigation of damages ; and, on the contrary, that when the act is committed deliberately or maliciously, it is good ground for increasing damages. In short, in such cases the damages are graduated by the intent of the party committing the injury. But in respect to the lunatic, as he has properly no will, it follows that the only proper measure of damages, in an action against him for a wrong, is the mere compensation of the party injured. The charge of the learned judge upon the trial was, therefore, in this respect, entirely correct."

The same rule which has been established in relation to the liabilities of lunatics, and which holds them responsible civilly for compensatory damages, but not criminally or for vindictive damages, because they have no will or intention to commit a wrong, applies in its full force to parties who act through the agency of others; and who, from the policy of the law, are made responsible to compensate all injuries sustained from the wrongful acts of their agents, whether those acts were committed with their approval, or in accordance with their will and intention, or not. And this is particularly true of railroad corporations, who must necessarily act by agents, and whose business could not otherwise be conducted.

In the Supreme Court of the United States, where the right of a party to recover vindictive or exemplary damages has been recognized in its fullest extent, the court confine it to cases of injuries where the conduct of the party has been "wanton or malicious, or gross or outrageous."

In *Day* v. *Woodworth*, 13 Howard, 371, referred to in the case against Quigley (21 How.), heretofore noticed, the Supreme Court uses the following language : "It is a well-established

principle of the common law, that in actions of trespass, and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff. In many civil actions, such as libel, slander, seduction, etc., the wrong done to the plaintiff is incapable of being measured by a money standard, and the damages assessed depend on the circumstances showing the degree of moral turpitude or atrocity of the defendant's conduct, and may properly be termed exemplary or vindictive, rather than compensatory.

" In actions of trespass, where the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff, which he would have been entitled to recover had the injury been inflicted without design or intention, something further by way of punishment or example, which has sometimes been called 'smart money.' This has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case. It must be evident also, that as it depends upon the degree of malice, wantonness, oppression, or outrage of the defendant's conduct, the punishment of his delinquency cannot be measured by the expenses of the plaintiff in prosecuting his suit."

Thus it will be seen, that the Supreme Court of the United States clearly recognizes, that where the injury is inflicted "without design or intention," "measured compensation" is the only damage a plaintiff can recover. Exemplary, punitive, or vindictive damages, have in view " the enormity of the offense." They depend upon the degree of " moral turpitude or atrocity of the defendant's conduct." They are permitted, when the injury has been " wanton and malicious, or gross and outrageous; " and they depend upon "the degree of malice, wantonness, oppression or outrage of the defendant." To this class of cases, and to this class alone, has the doctrine of vindictive or exemplary damages ever been applied. In what way is it possible to predicate wanton, malicious, or gross and outrageous conduct

New Orleans, Jackson, and Great Northern R. R. Co. *v.* Bailey.

of a defendant, who is sued, not for an injury inflicted by him personally—not for a wrong, knowingly permitted by him—but for the conduct of another, acting in his employment, and who committed the wrong complained of without the knowledge or consent before, or the ratification or approval after the wrong was done? We have carefully examined the English and American books, and have been unable to find an adjudicated case, or even a dictum, in which it has been ruled that exemplary damages can be given against the principal for the act of his servant, however wicked, criminal, or atrocious that act may be, unless the principal either expressly or impliedly authorized or ratified the act; or unless the proof in some way implicated the principal, in the negligence, misconduct, or criminality of the servant, or unless the principal had done something which he ought not to have done, or omitted to do something which he ought to have done, and thus incurred the imputation of gross negligence, or wilful wrong, in the just and proper performance of his own duties.

We are aware that counsel for the defendant in error have invoked, in his behalf, some adjudications made by this court, and claim that they establish a different rule ; but when examined it will be found that these cases will not sustain the charge given by the court below, and in no wise conflict with the position contended for by us.

The case of *Bell* v. *Morrison*, 27 Miss. R., was a suit brought directly against the wrong-doer, and, of course, authorized punitive damages, in accordance with the rules stated by me.

The case of *Mayer* v. *McClure*, 26 Miss. R., simply decided the liability of the principal, for the fraud, malfeasance, or neglect of the agent, no question of punitive damages being involved.

The case of *Heirn* v. *McCaughn*, 32 Miss. R., was an action brought against a steamboat company for the wrongful act of one of the company itself, committed by the managing partner of the concern. The court stated that there " was evidence of fraud, gross negligence, and oppression, and testimony showing that the captain, who was one of the partners, was guilty of

wilfully and capriciously disregarding the obligations of the company."

In *Patton* v. *Vicksburg and Jackson Railroad Co.*, 28 Miss. R. 156, the injury was sustained in consequence of the neglect of the company in failing to keep the road-bed in sufficient repair, and to furnish proper engines and servants to rightfully conduct the business of the road.

In *Hurst* v. *New Orleans, Jackson, and Great Northern Railroad*, 36 Miss. R. 660, the corporation on being informed of the wrongful act of their servant ratified his conduct, refused any reparation, continued him in their employment, and thus made his act their own.

All of these cases, therefore, might well warrant the court in refusing to set aside the verdicts of the jury, giving exemplary or vindictive damages, because they were all cases in which the defendant himself had been guilty of negligence, or some wrongful act on his part, or had ratified the wrongful act of his agent.

The case of the *New Orleans, Jackson, and Great Northern Railroad Company* v. *Albritton*, 38 Miss. R. 242, on the facts disclosed in the evidence, appears to be correctly decided, and is in accordance with the principles we have endeavored to maintain in this argument. It is true there are some general expressions used by the judge, delivering the opinion of the court, which, disconnected and separated from the facts proven in the case, might seem to bear a different construction. But it is a well settled principle of jurisprudence, that the general language used by a court, is to be applied to the special facts of the case in which it was used. And when another case, different in facts, different in circumstances, and different in principle, comes before it, no precedent is considered as established by the previous adjudication which will exclude the court from examining the subsequent case according to the facts disclosed in it, and deciding it upon its own merits.

Thus, Best, C. J., in *Richardson* v. *Mellish*, 9 English Common Law R. 400, declares the rule: "There are expressions used, by the Chief-Justice in that case, which seem

to bear on the present; but the expressions of every judge must be taken with reference to the case on which he decides, otherwise the law will get into extreme confusion. That is what we are to look at in all cases. The manner in which he is arguing it is not the thing; it is the principle he is deciding. If ever I could have imagined it would have been extended to such a case as this, I would have protested against it, though I could not have prevented the decision. I would, in my place, have protested against it, for I should have seen the injustice and confusion to which such a doctrine would have been liable to be extended. I am quite satisfied that not one of the learned judges who decided that case, ever conceived that its authority could be pressed to what it has been pressed in this case."

In the same case, Burrough, judge, expressed the rule : " In *Blackford* v. *Preston*, a great number of general phrases were made use of by the learned judge. But you ought not to govern courts of justice by general expressions used in the administration of the law. They may have some weight, but they ought not to govern; you must look to what the point of decision was."

Keeping in view these correct rules, in relation to the force of adjudicated cases, we will ask the attention of the court to the facts in the Albritton case, and to the actual points decided in it. The proof established the following facts : That Albritton was a passenger upon the cars of the railroad company when the injury was sustained; that the car in which he was, came in collision with another car belonging to the same company, moving in the opposite direction; that the engineer of the colliding car was out of time, as fixed by the time-table of the company. He was informed that the whistle of the engine of the advancing train had been heard giving notice of its approach; and that he started off without the conductor, and against his orders; and that he had been seen with a bottle belonging to one of the passengers, anterior to the collision. But it was not proved what the bottle contained, or whether he drank from it or not. It was also in proof, that the engineer

occasionally took too much liquor when off duty. But he was never known to drink whilst engaged in running a train.

On this state of facts the Circuit Court ruled: 1st. That the fact of collision was *primâ facie* evidence of liability, and cast the *onus probandi* on the company, making it requisite for it to prove that the engineer was in every respect qualified, and acted with reasonable skill and the utmost caution; 2d. That the company was liable for the gross neglect, or wilful and intentional misconduct of the engineer; and 3d. That in such case the jury might find all actual and consequential damages proved to their satisfaction, and also exemplary damages, provided the plaintiff received a bodily injury, caused by the gross negligence, or wanton and wilful misconduct of the engineer.

These rulings of the court below were approved by this court, and certainly do not conflict with the positions heretofore taken by us.

The fact of the collision being established, cast the burden of proof upon the company, to show that the engineer was in every respect qualified, and acted with reasonable skill; and, in the absence of such proof, the case was presented to the jury, as one in which the company itself was guilty of negligence, in failing to provide a competent and faithful engineer. As a matter of course, if the company was guilty of a neglect in this particular, they became responsible, not only for the wrongful act of their agent, for which they were bound to make compensation, but they were also liable for their own wrongful act in failing to provide a competent engineer; and for this were properly accountable in punitive or exemplary damages. So that the case of Albritton only decides that a railroad company may be held liable for punitive or exemplary damages, if they fail to provide competent and skilful engineers, and in consequence thereof, a passenger sustains bodily injury, through the gross neglect or wilful misconduct of their agent.

And in that particular case, the railroad company was certainly guilty of gross neglect, in keeping an engineer on the

passenger train, whom they knew, or upon such inquiries as they ought to have made they would have known, was in the occasional habit of drinking too much. From our knowledge of the habits and conduct of every man who is in the habit of drinking too much, it is gross neglect to confide in his resolution and firmness of purpose, and so confiding, to put him in places of great trust, requiring skill, capacity and sobriety, upon the presumption that he will have the resolution to keep sober at all times while in the performance of his duties; when it is known that he is in the habit, when off duty, of getting drunk, or, in the language of the Albritton case, " of occasionally, when off duty, taking too much liquor," no prudent man would confide to him a trust requiring perfect sobriety, and where the lives and persons of the public were in his charge.

This case left to the consideration of the jury two questions: 1st. The negligence of the company in providing its agents and engineers; 2d. The negligence of those agents, in the performance of their duties; and held the company liable in exemplary or punitive damages when the two propositions were established, or were properly to be inferred from the proof, that the company was negligent in the selection of its officers, and that those officers were negligent in the performance of their duties.

In the case of Bailey, now under consideration, the circuit judge overlooked the correct principles governing cases of this kind, and which were laid down in Albritton's case. He instructed the jury, that if they found for the plaintiff, they were not restricted in giving damages to the actual positive injuries sustained, but might give damages as a punishment, by way of example, and to deter others; thus leaving to the jury the right to infer, that in every case where a party is liable to make compensation for the gross negligence or wilful misconduct of his agent, he may also be held liable for exemplary damages; whereas, the true rule is, that the principal is only liable in exemplary damages for the wrongful act or misconduct of his agent, when that act has been directed or approved by himself, or where he himself has been guilty of some neglect in the selection of the

agent. Even in such cases, exemplary damages are never given, unless the injury resulted from gross neglect, or was wanton and wilful—conceived either in the spirit of mischief, or of criminal indifference to civil obligations. 21 Howard R. 214; Sedgwick on Damages.

After examining various authorities establishing the rule that a principal is liable for the wilful trespass, as well as the neglect of his agent, the court, in the Albritton case, makes use of the following language : " It is no answer to the soundness of these views, to say, that the doctrine of *respondeat superior*, thus extended, involves the innocent with the guilty. The books abound, not only with strong cases of recovery against common carriers, wholly without fault on their part, sanctioned by the most learned judges and enlightened courts—but their inflexibility in maintaining and even extending these salutary rules of law, without bending to popular sympathies or yielding to the hardships of a particular case, has been the subject of just admiration and compliment." See 2 Kent., 9th ed. 812, 813.

The rule of law is certainly correctly stated in the above paragraph. Not only are common carriers, when wholly without fault, held liable for injuries done by them ; but in all cases as carriers of goods, whether with or without fault, they are actual insurers against every loss, unless it be occasioned by the act of God, or the public enemy ; and when carriers of persons, they are liable for every injury a passenger may sustain, which could have been prevented by the utmost caution of a very prudent and careful man. It is also true, that common carriers are liable, as are all other persons engaged in any business, to answer in damages, when wholly without fault, for the wrongful, negligent, wicked, or intentional wrong of their servants and agents. Public policy demands this—the interests of society require it—and in relation to railroad companies, the " enhanced facilities, dangers and necessities, growing out of the new modes of travel invented by the age," admonish every court not to relax or modify the rule. But while principals are thus held responsible, though entirely innocent them-

selves, for the wrongful or negligent acts of their agents, the question arises, what is the extent of responsibility, and what the measure of damages, for which they shall be answerable. We insist that it is entirely compensatory. That it is to recompense the sufferer for every pecuniary loss he may have sustained—for every bodily pain inflicted—for every personal indignity—for all mental suffering; in short, for everything personal to himself, and right and proper to repair the wrong inflicted on him. But there the law stops; and we respectfully insist, as we have heretofore endeavored to show, that no case can be found in which punitive or exemplary damages have ever been given against an innocent principal. Why should this be the rule ? Because, as Sedgwick says, " where the elements of fraud, malice, gross negligence, or oppression, mingle in the controversy," the law abandons the system, and even the language of compensation, and inflicts exemplary damages to punish the offender. But where the principal is innocent of intentional wrong, in what way has he offended, for what purpose, and to whom is his conduct to be made an example ? He has committed no crime. He has been guilty of no offence. He only had the misfortune to employ a faithless or a wicked agent. If he compensates the injured party for all his losses, he surely has performed his whole duty. Having committed no crime, and been guilty of no offense, he owes no obligation to society for which he should be punished, or held up as a warning and example to others.

. This is the well settled and universally established principle of English and American jurisprudence.

" In *Holt* v. *Nichols*, 1 Salk, 289 ; and Ellenborough, C. J., in *Crockford* v. *Winter*, 1 Camp. 124, lay down the broad doctrine, that a principal is answerable civiliter, though not criminaliter, for the fraud of his agent."

" The general rule is, that the principal is responsible, civilly, for the acts of his agent, but not criminally, unless done under his express authority," says the Supreme Court of Texas. 8 Texas R. 6.

In the case of *Harding* v. *Greening*, 3 English Common

Law R. 176, Gibbs, C. J., says: "There is a marked distinction, perfectly familiar to our law, and consistent with the principles of all laws, between fixing persons with criminal and civil responsibility, by the acts or through the medium of others. The acts of the servant are only the acts of the master *sub modo*, and the rule is narrower in actions of tort than in actions on contract."

An admission by the counsel for the plaintiff, at the trial of an action of trespass, that the defendant acted without malice, precludes the plaintiff from claiming vindictive damages. Sedgwick on Damages, 556; *Hoyt* v. *Gelston*, 13 Johns. 141; (S. C.), in error, Id. 561.

In cases of personal injury and mutilation, "exemplary or punitive damages, or smart money, as they are often called, are given by way of punishment, for intentional wrong." Sedgwick on Damages, 2d ed. 389, note 1; 10 Barbour New York R. 621.

"These damages are allowed for an unlawful or injurious act, conceived in the spirit of mischief, or a criminal indifference to civil obligation." 21 Howard's U. S. C. R. 202.

Thus it will be seen, while the reason and policy of the law will require the principal to compensate the injured party for all the damages he may have sustained by the wrongful act of an agent in the course of his employment, none of the reasons ever given by the courts will authorize the rendition of a judgment for exemplary or punitive damages, where the principal is without fault.

To render such judgment, it will be necessary to extend the rule to confound the innocent with the guilty, and to abolish that marked distinction which Chief-Justice Gibbs says is perfectly familiar to our law, and consistent with the principles of all laws, between fixing persons with criminal and civil responsibility by the acts, or through the medium of others.

In the Albritton case, the judge delivering the opinion of the court, remarked: "Indeed, even criminal responsibility attaches to the principal for the acts of the agent, in some cases where the principal is wholly ignorant of the act of the agent."

For this rule, reference was made to Wharton's American Criminal Law, section 153.

We have taken some pains to examine the authorities referred to in that work. In speaking of the liability of the principal for the criminal act of his agent, where the agent is acting at the time in the line of the principal's business, but without specific instructions, the author says: "In this case, as where a bar-keeper in a hotel sells liquor, or a salesman in a book-store in the usual course of business sells a libellous book, or where a clerk publishes a libel in a newspaper, the principal is responsible, and, if there be other evidence, may be convicted." The cases cited for this position, upon examination, will be found to be based either upon an express statute, declaring the responsibility of the principal, or else simply to declare that as a rule of evidence a jury may presume or imply, in the absense of proof to the contrary, that the act was done by the connivance or with the knowledge of the principal, or that he was guilty of a criminal neglect in placing it in the power of his agent to violate the law. This is true of all cases, except that of *Rex* v. *Gutch*, Moodie & M. 433. Referring to this case, the author says: "Even the fact that the principal, who was the publisher of a newspaper, was living at the time one hundred miles distant from the place of publication, was at the time sick, and entirely ignorant of the libel being published, is no defense." The case of *Rex* v. *Gutch*, was a decision made by Lord Tenterden. It stands solitary and alone in the history of English and American jurisprudence. There is even doubt whether the case is correctly reported. But, if so, as an isolated case, directly contrary to the uniform spirit of the common law, and at war with every principle of justice, it will certainly not be followed as a precedent, or, at least, not be extended beyond the peculiar class of cases in which it was made.

It was a prosecution for libel; and when it is borne in mind that for many years the English judges, for the purpose of upholding the government and maintaining the prerogative of the crown, felt it to be their duty to warp the rules of law,

regardless of the rights of the individual, in order to assure convictions, we are satisfied that the courts in this country will not feel inclined on the strength of such a precedent, made under such circumstances, to enlarge or extend the rule to other cases, not falling directly within its facts, or within its reasons. As applicable to cases of libel, especially of libels against the government, there may seem to be some shadow of foundation for such a rule, growing out of the fact that a party might establish a press for the general purpose of attacking the government, and, placing it in the hands of an irresponsible agent, might evade responsibility by pleading ignorance of the particular libel, although, in truth, it was published in pursuance of a general plan. Such were the reasons which operated on the mind of Lord Tenterden in this case.

On the subject of general liability of a principal for the criminal act of his agent, and in reference to the exception which the above case might seem to establish in prosecutions for libel, Paley in his work on agency, says: " The principal is never criminally answerable for the act of his deputy ; they must each answer for their own acts, and stand or fall by their own behavior. To affect the superior criminally by the act of his deputy, there must be the command of the superior for the act in question. An exception, however, to this general rule seems to have been introduced into the law, in cases of libel." (Paley on Agency, 304.) Referring to the case of *Rex* v. *Gutch*, he quotes the language of Lord Tenterden, as seemingly to establish this exception. Lord Tenterden, in that opinion, says: " Surely a person who derives a profit from, and who furnishes means for carrying on the concern, and intrusts the conduct of the publication to one whom he selects, and in whom he confides, may be said to cause to be published what actually appears, and ought to be answerable, although you cannot show that he was individually concerned in the particular publication. It would be exceedingly dangerous to hold otherwise ; for then an irresponsible person might be put forward, and the person really producing the publication, and without whom it could not be published, might remain behind, and escape alto-

gether." It will thus be seen, that only in the case of libels, has it ever been ruled that a principal will be held liable, criminally, for the act of his agent ; and the rule was established in those cases, from their peculiar character; and the reasons can have no application to the case at bar, or to others of a similar character.

But even in the case of *Rex* v. *Gutch*, Lord Tenterden, delivering the opinion of the court, says : " I do not mean to say that some possible case may not occur in which he would be exempt; but generally speaking, he is answerable."

In the case of *Commonwealth* v. *Nichols*, 10 Metcalf, 259, a prosecution against the owner of a drinking house for liquor sold by his servant, the court, declaring the civil liability of the master, states, that " to charge him criminally there must be such a direct participation in the act, or such assent and concurrence therein, as would involve him morally in the guilt of the action ;" and it was held, that a sale by the servant, in the shop of the master, is only *primâ facie* evidence of a sale by the master. " If the sale was made by the servant, without the knowledge of the master, and really in opposition to his will, and in no way participated in, approved, or countenanced by him, and this is clearly shown by the master, he ought to be acquitted."

In the case in 7 Serg. and Rawle, 469, where it was held that a party might be made responsible, criminally, for the act of his servant, if he participated in it, the judge, delivering the opinion of the court said : " I did not instruct the jury that the defendant was criminally answerable for the act of his servant or agent; but I left it to the jury to infer, from the whole body of the evidence, whether he was concerned in the sale of this ticket."

The case in 3 Humphreys, 203, was of a similar character, and only decided that the guilt of the master might be inferred from circumstances.

And in *Rex* v. *Almon*, 5 Burr, 2686, Lord Mansfield held, even in the case of libels, that the relation of master and servant was only *primâ facie* evidence of the guilt of the master, and

that he might avoid the effect of it, by showing that "he was not privy nor assenting to it, nor encouraging it."

See also 2 Starkie on Slander, 2d edition, 34.

In the case against Quigley, 21 Howard's R, 202, before referred to, and which was an action on the case for libel, the Supreme Court of the United States positively refused to allow punitive damages, because the record did not show that the act complained of "was conceived in the spirit of mischief or a criminal indifference to civil obligations." This was an action against a railroad for a libel published, not by an inferior agent, but by the directors themselves, who, in contemplation of law, being the representative body, are, for all legal and practical purposes, the corporation itself.

In England, so much was the ruling in the case of *Rex* v. *Gutch* opposed to the principles of the common law, and antagonistic to those rules of justice which should rightfully regulate criminal liability, that the Parliament, in order to correct the abuses which would arise from it, enacted, that thereafter the party publishing the libel should only be held responsible, and that the principal should not be punished criminally, unless he approved or directed the act of publication; but it would be presumed that such approval or direction was given, unless the principal negatived such presumption by proof. Smith's Master and Servant, 125, 126.

Exemplary damages are inflicted as a punishment against a wrongful offender, "and as an example to de  others from similar acts of atrocity." How absurd to apply  h a rule to an innocent principal, for the criminal act of h  agent! No one would pretend that an indictment for an assault and battery, or for murder or other felony, could be maintained against a principal for the crime of the agent, while in the employment of the principal, unless by his direction or connivance, either as accessary before or after the fact. If such an indictment will not lie, with what show of legal propriety can criminal punishment be inflicted indirectly, on behalf of the public, in actions brought to redress private wrongs, where the public cannot punish directly for the same act? Every reason of the law which

APRIL TERM, 1866.    433

New Orleans, Jackson, and Great Northern R. R. Co. v. Bailey.

forbids the criminal prosecution on behalf of the State of the principal for the crime of his agent, or the master for the wrong of his servant, applies with equal force against punishing him with vindictive damages at the suit of a private party.

The damages are always given as a punishment, and proceed upon the idea of crime committed and punishment to be inflicted. See Sedgwick on Dam. 667.

In *Cook* v. *Ellis*, 6 Hill's R. 465, the Supreme Court of New York say: "We concede that 'smart money,' allowed by a jury, and fines imposed at the suit of the people, depend on the same principle. Both are *penal*, and intended to deter others from the commission of the like crime; the former become, however, compensatory for damages, and at the same time answer the purpose of punishment."

The rule that punishment will not be inflicted on a principal, for the wrongful act of his agent, was very clearly announced by this court, in the case of *Cocke* v. *Board of Police of Copiah County*, 38 Miss. R. 343, in which Cocke was sued for a statutory penalty, for the failure of his overseer to work the road with his slaves, after notice served on the overseer. Handy, C. J., said: To make the owner liable to a forfeiture, which had been incurred without his knowledge or consent, and when he was in a situation in which he could not reasonably have prevented it, would be contrary to all principle."

That compensation only, and not punishment, will be adjudged for torts, where there is an absence of intentional wrong, even against the actual trespasser, has been distinctly declared in Alabama, in case of *Russel* v. *Irby*, 13 Ala. R. N. S. 131. An action was brought for the penalty, given by the statute, for cutting timber on the land of another. The court declared that an unintentional trespass was not actionable under the penalties of the statute.

A like decision was made in *Batchelder* v. *Kelly*, 10 N. Hamp. R. 434, and a similar view was expressed in this court in *Perkins* v. *Hackelman*, 26 Miss. R. 41.

Secondly. If, however, we are mistaken in the foregoing views, there are other errors in the record, for which the judgment

28

must be reversed. The fifth and sixth instructions given in behalf of the plaintiff below, are substantially, as follows: " The railroad company is not only responsible for the employment of skilful agents of good habits, but also that they acted with reasonable skill, and with the utmost prudence and caution; and if the disaster was occasioned by the least negligence, or want of skill, or prudence on the part of such agents, the road is liable in damages; and that as the railroad company were engaged in transportation, by the dangerous and powerful agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence, and any negligence in this case may well deserve the epithet of gross."

It is plain, in giving these instructions, that the court misconceived the liability of the railroad in this case, applying to it the rules which regulate the responsibility for injuries to persons of whom they are carriers, and in privity of contract, instead of the rules which define their liability for injuries to third persons, not being passengers, and to whom the road is therefore not under the special obligation of extreme diligence, exacted in the case of passengers. The rule of law is without exception, that as to such third persons, the railroad is only responsible for injuries arising from a want of ordinary care and skill on the part of its servants; that is, such care and skill as the mass of persons in their business are accustomed to exercise. This rule is stated as follows: " That the highest diligence is not to be exacted of any person, except when a compensation is paid for the service, or when the party injured is in the power or under the control of the defendant, as in the case of passengers, or the party officiously obtrudes his services upon another, or is the sole party deriving a benefit from the act, or that the party occasioning the injury was in the wrong place or engaged in an unlawful calling; and where both parties stand on an equality, as to the means of avoiding the accident, and both are engaged in a lawful employment, only ordinary diligence will be required of the company." Pierce's Railroad Law, 266; *Brand* v. *Schenectady and Troy Railroad*, 8 Barbour's R. 368, 379.

At the same time, it is also true, that the care and skill to he reasonable, must be proportioned to the danger, and the multiplied chances of injury. Similar precautions to avoid danger are required of persons who have occasion to be in the vicinity of engines. Pierce's Railroad Law, 269, and cases there cited.

The difference between the liability of railroads, as carriers for injuries to passengers, and their liability for injuries to third persons, has been distinctly recognized by this court in the case of *Mississippi Central Railroad Co.* v. *Samuel Miller*, not yet reported.

In that case the court says: " It is only necessary to notice the fifth instruction, which is to the effect that, " persons having charge of engines and locomotives on railroads, are bound to manage them with the utmost care, and a failure to do so is negligence in the law, for which the railroad company is responsible, if damage ensues to the property of another from such neglect so to manage their engines." As applicable to the liability of railroad companies, as common carriers, for injuries to persons and property carried on their roads, that instruction was entirely within the rules of law. But in reference to the case before the court, its language is too broad. The true rule on the subject of injuries to third persons, towards whom the railroad company has not incurred the liabilities of a common carrier, was laid down by the judge, in the second instruction given on behalf of the defendant, as follows: " The railroad company, in order to prevent injury and destruction to stock on their track, are only bound to use such reasonable care and prudence in running, as a prudent man, engaged in the same business, would use to avoid such injury and destruction."

The case in which the rule was thus laid down, was an action for damages, for injury to stock crossing the railroad; but the same rule applies to persons not being passengers, injured while on the railroad track. It has been so held uniformly in many cases. See Pierce's Railroad Law, 255, and cases there cited; and also, case of *Central Military Railroad* v. *Rockafellow*, 17 Illinois R. 650, and 16 Illinois R. 198.

It is evident from these cases, that the court below erred in

436    HIGH COURT OF ERRORS AND APPEALS.

New Orleans, Jackson, and Great Northern R. R. Co. v. Bailey.

laying down the rule, " that the utmost prudence and caution in this case, was required of ' the defendant.' " It also erred in ruling, " that the least negligence or want of skill or prudence on the part of defendants or their agents, made them responsible." It also erred, in ruling, " that the defendant was required to exercise the greatest care and diligence, and that any negligence in this case deserved the epithet of gross." The injury to Bailey was done to a third person, not a passenger on the road. It is true, he was lawfully on the side track at the time of the accident. So too was the engineer of the defendant lawfully there ; and both being engaged in a lawful employment, both parties stood on an equality, as to the means of avoiding the accident, and only ordinary care was required of the company, or its agent. The same degree of care to avoid danger was also required of Bailey.

The rule, that any negligence on the part of railroad companies amounts to gross negligence, is in our opinion not true in any case, even for the injuries to passengers on the cars. We are aware that there is such a doctrine in the case of *Day* v. *Woodworth*, 13 Howard R. 371, but the dictum is sustained by no previous adjudications, is contrary to commonsense, and conflicts with the rule universally established by previous cases, that railroads, as carriers of passengers, are only required to exercise the highest degree of diligence and skill which a reasonable man would use under such circumstances. To hold that any degree of negligence in such cases is gross, would demand absolute perfection in the railroad company, its officers and agents. The most cautious, careful, and prudent man, will at times be guilty of some neglect in the conduct of his affairs. And the courts have uniformly held, that the measure of damages, where neglect is established, shall be apportioned to the degree of neglect. Where it is slight, compensation only is made to the injured party. Where it is gross, evincing wanton carelessness and disregard of duty, in addition to compensation, vindictive damages, by way of punishment, are awarded.

Thirdly. But, if possible, the ninth instruction given at the

instance of the plaintiff below, is more erroneous than any other ruling of the court. It declares that it was not sufficient for the engineer to have given the usual warning, "and even if the jury were satisfied that such usual warning was given, yet the defendants were liable, if the engineer did not give all the warning and use all the caution that the nature of Judge Bailey's position, and the time of the night, and the locality required, and that damages should be awarded against them, for want of such reasonable caution and warning, that the nature of the case, time of night, and locality required."

We are at a loss to understand what legal proposition the judge intended to establish by this instruction. The jury were left without any rule of law to guide them, and each juror was authorized for himself to determine what degree of care was required of the engineer in this particular case.

This instruction is erroneous, because it undertakes, in the first place, to decide the facts, and then upon the facts thus declared by the court, it is announced that the usual warning, if given by the engineer, was not sufficient. But it is also erroneous, because the court does not determine the degree of care to be used by the engineer. He was required to give all the warning, and use all the caution, that the "nature of Judge Bailey's position, and the time of night, and the locality required."

Whether this care was to be the ordinary care which a prudent man would have used under like circumstances, or the utmost care which a very prudent man would have used, is not declared by the court. The rule as laid down exacting "all the warning, and all the caution, that the nature of Judge Bailey's position required," is indefinite, tended to confuse the jury, and seemed to imply, that even the utmost caution which a very prudent man would have used under like circumstances, the highest degree of diligence ever exacted, was not sufficient. The engineer might have used, and we think he did use, this degree of caution; and yet the jury, under the instruction given, might have supposed that even this was insufficient, and that more care and warning should have been used, because Judge Bailey's position, and the time of night, might have required it, in

order to have avoided the accident.    Under this instruction, if it was humanly possible to have avoided the collision, it was made the duty of the engineer to have done so.    This is a greater degree of care, and a severer rule than has even been pronounced in any case, and would, in every conceivable case, make the company responsible; because by using all the caution, and giving all the warning that could possibly be given by any one, every collision might perhaps be avoided. The instruction is also obnoxious, because it undertakes to declare the facts in relation to Judge Bailey's position; and assumes that his position was known to the engineer, and therefore demanded of him special and particular care, and unusual and extreme caution; whereas, it does not appear in evidence that the engineer either knew, or had any reason to suppose, that Judge Bailey was upon the car, or anywhere near the track.    Hewston proves positively that he did not know it. Nor is there the least evidence tending to show that he knew anything which required him to be more careful than usual, or to give other than the usual warning, which under ordinary circumstances would have been sufficient.    Inasmuch, then, as this instruction does not establish as a rule of law the degree of care which the engineer should have used, but leaves that entirely indefinite and to be determined by the jury, and as it also assumes facts as true which it was the province of the jury to find, and also assumes knowledge of these facts on the part of the engineer, while there is no evidence touching that point in the record, and as it exacts more care than the law has ever required, we are satisfied that the case should be reversed, because of these errors in it.    This instruction (the ninth) is also erroneous, because it makes the railroad company liable for failing to exercise "extreme diligence," or the utmost care; a rule applicable only where passengers seek compensation for injuries sustained by them, and not applicable to suits by third parties not passengers, who can claim, as we have before shown, no more than ordinary care; that is, such care as the majority of men would ordinarily exercise under like circumstances.

Fourthly. The eighth instruction was also erroneous. It was irrelevant, was not based on any of the facts proven in the case, and had a tendency to mislead the jury, who necessarily inferred from it that, in the opinion of the court, the company had been derelict in their duty, in the particulars mentioned in that instruction; and that it was not sufficient for them to have used, by mutual arrangement with the Central Railroad Company, the switches, sidings, etc., belonging to that company; and were therefore responsible for injuries resulting from the use of the siding belonging to the latter company.

Fifthly. The tenth instruction is also erroneous, and should not have been given, because there was nothing in the facts of the case to warrant it. It is proved positively, and there is not one particle of evidence conflicting, that the two companies had mutually used one another's tracks, tables, and sidings, and that the defendant had, with the knowledge and consent of Bailey, as well as of the Central Railroad, been in the habit of using the siding before the accident. The instruction could only therefore have had a tendency to mislead the jury, and to perplex them as to the nature and kind of authority requisite to entitle them to use the siding. But in addition to this, the instruction is erroneous, in not defining the degree of care and caution necessary for the defendants to have used in the case supposed; and also in not defining the degree of care and caution which the plaintiff ought also to have used, in order to have avoided the danger.

Sixthly. But the court erred also in refusing a new trial. There was no evidence in the case whatever establishing the least want of care on the part of the engineer; on the contrary, the proof is clear that he exercised all the diligence requisite and proper under the circumstances; that he was in the lawful pursuit of the business of the company, and that the engine was rightfully moved by him on the side track of the Central Road.

The facts also show a want of due care and caution on the part of Bailey, and that the accident resulted as much or more

from such want of caution, than any other cause. It is a well established rule, that a party suffering from collision with the engines of a railroad, must show that he used ordinary care to avoid the danger, in order to enable him to recover; and if he is himself chargeable with a want of such care, and thereby contributed to the injury, he is without remedy. Pierce's Railway Law, 273.

What are the facts in this case? From the testimony of Frost, of Otto, of Hewston and Bruner, the right of the defendants to use the side track is placed beyond doubt; and that they were in the habit of using it, with their engines and cars, and this, too, with the knowledge of Bailey, is also clear. In fact, there is not a particle of conflicting proof on this point. The proof also shows that the accident occurred at a very busy season of the year; that it took place after dark; that up and down passenger trains, of both the Central and the New Orleans road, reach Canton about that hour of the night, and had consequently much occasion to use the main tracks as well as side tracks of both roads; and that at the very instant of the accident the freight train of the Central road had reached Canton, and was using the main track and turn-table of the New Orleans road, making it necessary for Hewston to back the engine and tender under his charge on the side track, in order to avoid collision. Hewston was then rightfully on the side track. He states the manner in which he backed the engine, and the care used in doing it. There is no testimony, whatever, which conflicts with his on this point. Bailey, in his testimony, speaks negatively on this subject. He says he did not see the light, nor hear the bell, nor in fact notice that the engine was upon the side track. This negative statement, coupled with other portions of his testimony, shows clearly that the accident is attributable to his own want of due care. He knew that Hewston had the right, at any time he deemed prudent or proper, to use the side track with the defendant's engines. He also knew that the cars were, about that time of the night, arriving and departing, making it more than probable that he would have occasion to use the side track. He might have known, and would have known,

if he had exercised ordinary diligence, that the freight train of the Central Railroad was on the main track of the defendants' road, using the turn-table, and that the engine in charge of Hewston, was also on the road, and, in order to get out of the way of the freight train, might be compelled to back upon the side track.   Notwithstanding these facts, it appears, from his own testimony, that he got upon the top of a loaded car, placing his back in the direction that an engine would move upon the side track, and that he thus stood, and was so much occupied in directing the loading of his cars, that he did not even know, until the act of collision, that Hewston had moved his engine on the side track.   It is true he says that he had no reason to expect any of the defendants' engines on the siding, at the time the accident happened.   But this does not exonerate him from the charge of negligence.   He knew that the defendants had a right to use the side track.   He also knew, or might have known, by using ordinary precaution, that the freight train of the Central Railroad was a short distance below the side track, and that train, or the engine in charge of Hewston, might have occasion, in order to avoid collision, to move on the side track.   When we consider the busy season of the year, a fact well known to Bailey as shipping merchant at that point, and that a large number of trains were constantly arriving and departing; and that, at the very time of the accident, two engines and trains were then moving in opposite directions on the main track of defendants, making it necessary to use the side track in order to avoid collision, it certainly evinced a want of ordinary prudence and caution on the part of Bailey to get upon the top of the car, place his back in the direction of the engines, and this too after dark, and to keep himself so occupied that he could not hear the advancing engines, or hear any signals or other notice given by it.

In the case of *Spencer* v. *Utica and S. Co.*, 5 Barbour's R. 337, it appeared that the plaintiff, in approaching the track, had an uninterrupted view of it, for a mile in the direction in which the train was coming, so that he might have seen it, if he had turned his eyes in that direction.   It was considered

that if the plaintiff saw the train, it was an act of madness in him voluntarily to place himself in its way; and if he did not see it, the reason was that he allowed his attention, unnecessarily, to be drawn another way. That upon such facts, it was impossible to maintain that he was free from negligence; and in order to recover, he must establish the proposition that he was himself without negligence and without fault. The want of ordinary care on the part of Bailey in this case, is much more striking and manifest.

So in the case of *Sheffield* v. *Rochester and Syracuse Railroad*, 21 Barbour, 339, it appeared that the train was running in the daytime, within a minute or two of its regular time, and could have been seen half a mile from the place of collision, and the plaintiff, who knew where the track was, and had been walking his horse for some distance when approaching it, was struck by the train at the crossing—it was considered, that his conduct showed inexcusable negligence, being like that of one courting destruction; that the most ordinary care would have prompted him to cast his eyes backward and forward on the railroad to·see if a train was approaching, and if he had done so, he could not have failed to escape the injury. It was declared to be a well settled and incontrovertible principle, that·an action for negligence cannot be sustained, if the wrongful act or negligence of the plaintiff, or his agent, co-operated with the misconduct of the defendant or his agent to produce the damage sustained, and that in order to recover, in such a case, the plaintiff must be without fault.

See also, *Reers* v. *Housatonic Railroad Co.*, 19 Conn. 566, and *Neal* v. *Gillett*, 23 Conn. 437, in which last case it was decided, that although the defendant has been guilty of gross negligence, in the absence of an intention to commit the injury, the plaintiff cannot recover, where by want of ordinary care he has materially contributed to the injury which he might have avoided by the exercise of such care.

In the *Chicago and Mississippi Railroad* v. *Patchen*, 18 Illinois R. 202, the court says: "While the court will, as to passengers and freights, apply the enforcement of the strictest

APRIL TERM, 1866.                    443

New Orleans, Jackson, and Great Northern R. R. Co. v. Bailey.

diligence, skill and care, and for want of them, measure the lia-
bility for slight negligence, yet the injured party must be free
from such negligence, as contributes to the injury complained
of." Various cases are there cited, and the court continues :
" These decisions concur in this as a general rule, and are sanc-
tioned by more than fifty decisions, referred to in them, made
upon a great variety of circumstances."

In *Parker* v. *Adams*, 12 Metcalf, 415, it was decided that
an action for injury, received from a collision of carriages
passing on a public road, cannot be maintained by a plaintiff,
who at the time of the collision was guilty of negligence,
although the other party was also guilty of negligence, and even
although he was on the wrong side of the road.

See also Sedgwick on Dam. 468, side page, and the numer-
ous cases there cited, establishing the general rule, that to
enable a plaintiff to recover, he must show the injury to have
been attributable to the neglect or wrong of the defendant,
and under such circumstances as to exonerate him from all
neglect of duty on his own part.

Applying the rules in these cases to the one under con-
sideration, it is plain that Bailey was not entitled to recover
for the injuries he received, because it resulted from his own
carelessness and failure to exercise that caution, which every
prudent man under such circumstances would have used.

While the evidence shows this want of care on the part of
Bailey, it equally establishes every proper precaution on the
part of defendants and their agent. It is proved by witnesses,
who knew Hewston well, that he was faithful and attentive to
business. It is also proved by Bruner, who has been railroad
engineer for eight years, that if Hewston sent out brakesmen
with lanterns, and backed up the siding with the care and
caution stated by him, he did all he could as a prudent man.
There is no evidence whatever, which shows that Hewston had
any knowledge that Bailey was on the side track at the time
of the accident, nor is there the least evidence tending to show
that he had any reason to suppose that Bailey was there at that
time. Taking into consideration all the facts, he must reason-

ably have concluded that he was not there. The plaintiff introduced no evidence showing any want of care on the part of Hewston; nothing that tended to impeach his skill and capacity as an engineer, nor anything that tended to show impropriety or misconduct on his part, at the time of the accident. It is true, that on cross-examination of Bruner, plaintiff attempted to cast some imputation upon the general character of Hewston for sobriety, but he signally failed. Bruner was the only witness whom he examined touching that point. All that he proved was, that he "had seen Hewston sometimes taking a drink, saw him one night, at half-past eleven o'clock, when he thought him drunk, but he had nothing to do at that time, and witness never saw him drinking when engaged in his usual business." If there had been any pretext for the suggestion of intemperance, which this cross-examination implied, Bailey could and would very readily have proved it by the different parties around and about the station at Canton, who were acquainted with Hewston ; and he would certainly have proved it by his own evidence, as he was acquainted with Hewston, and in the conduct of his business, had daily-intercourse and constant communication with him, and was therefore perfectly acquainted with his habits and character.

When, therefore, we take into consideration the erroneous rulings of the court, in applying the severe and rigid rules which regulate the transportation of passengers—between whom and the railroad companies a privity of contract exists, and who must necessarily rely for the safety of their lives and persons upon the capacity of the agents, and the proper management of the road to the present case, where there is no such privity of contract, and no such trust established ; when, too, we reflect that the court applied to the present case, where no wilful wrong, no intentional blame, not even subsequent acquiescence or approval, can be imputed, the doctrine of exemplary or punitive damages, a doctrine anomalous in its character, and only tolerated for the purpose of reaching gross, wilful, wanton, or malignant negligence or misconduct, that would otherwise go unpunished ; when we consider, too, that these

erroneous rulings of great general principles were united with misdirections in regard to the particular rules of law applicable to this case, and with a refusal to grant a new trial, and that the evidence not only failed to show negligence on the part of the defendant or its agents, but showed positive and actual neglect on the part of the plaintiff—we feel assured that this court will not hesitate to reverse the judgment, and remand the case for a new trial, in order not only that justice in the particular case may be administered, but that such general principles may be established as will enable railroad corporations so to conduct and manage their affairs, that while the rights of individuals are protected, the great commercial and financial interests of the State, dependent upon them for full development, may not be impaired or destroyed.

*Franklin Smith*, for defendant in error.

I. As to the instructions, it will be found that they were more favorable to the defendants, the facts considered, and less so to the plaintiff, than the law justified.

The first two instructions for plaintiff contain the law as settled by this court. *Bell* v. *Morrison*, 5 Cushman, 85, 86; *Heirn* v. *McCaughn*, 3 George, 48, 49; *Vicksburg and Jackson: R. R. Co.* v. *Patton*, 2 George, 195, 198; *N. O., J. & G. N. R. R. Co.* v. *Albritton, etc.*, 38 Miss. R. 274.

2. The same may be said of the third instruction for plaintiff. *Vicksbury and Jackson R. R. Co.* v. *Patton*, 2 George, 196; *Mayer & Co.* v. *McLure*, 36 Miss. R., 7 George, 403.

3. The fourth instruction for plaintiff was refused, although the law had been settled in other courts, and recently in ours. Authorities collected by Judge Harris in *N. O., J. & G. N. R. R. Co.* v. *Albritton*, 38 Miss. R. 274, 275.

4. The fifth and sixth instructions, asked by the plaintiff, are now the settled law as to public carriers using steam engines; in other words, all railroad companies. *N. O., J. & G. N. R. R. Co.* v. *Albritton*, 38 Miss. R. 274; Angel on Carriers, section 568; 14 Howard's R. 486; *Vicksburg Road* v. *Patton*, 31 Miss. R. 196; *Stokes* v. *Saltonstall*, 13 Peters' R. 193; 14

Howard's U. S. R. 483, 486; 1 American Railway Cases, 124, 128, 177.

5. The seventh instruction, *refused* by the court *to the plaintiff*, contains the settled law, and is almost in the precise language of the court in the case of the *Vicksburg and Jackson R. R. Co.* v. *Patton*, 31 Miss. R. (2 George), 193.

6. The eighth instruction, given to the plaintiff, that a railroad corporation or carrier must not hurt either travellers or persons on or near the road, or property, and that doing so by reason of their not providing an abundance of conveniences, vehicles, machines, sidings, tracks, superintendents, and all things necessary to protect the public (and to properly facilitate their business), is clearly sustained by public policy, reason, and authority. *Lowell* v. *Boston and Lowell R. R. Corporation*, 23 Pick. R. 24; 1 Amer. Railway Cases, top page 284, 287; *Cumberland Valley R. R. Co.* v. *Hughes*, 2 Amer. Railway Cases, top page 347, 348; 11 Penn. R. (1 Jones), page 141; Angel on Carriers, section 544–547; *Sager* v. *Portsmouth R. R. Co.*, 1 Amer. Railway Cases, 171, 179; 31 Maine R. 228; 1 B. & P. 409; *Vicksburg and Jackson R. R. Co.* v. *Patton*, 32 Miss. R. (2 George), 195, 196, 197, 173, 174, 180.

These authorities reduce the defendants to this dilemma: If their agent acted negligently, improperly, unskilfully, or mischievously, the corporation is responsible of course. If, when the company's track connects with the other track, there was not room enough for the agent to go anywhere else by reason of the want of sufficient sidings or tracks, such want of sufficient tracks, roads, sidings, or conveniences, as would necessitate their agent to injure another while in the prosecution of his lawful business, *is no defence to this action.* It was their duty to guard against every contingency in running such " dread engines," and to be provided with abundance of officers, roads, tracks, lights, bells, and every other appliance necessary to guard against injury to others. That is the condition on which they " live, move, and have their being."

And this leads to the consideration of the ninth instruction to the plaintiff, which declares the proposition that the corporation

cannot protect itself by their agents giving ordinary warning, usual warning, nor observing statutory rules, or ordinary regulations, but it was their duty to take all the precautions, and to give all the warning that the time of night, the nature of the locality, Judge Bailey's position, and the surrounding circumstances, *at that particular time, required.* *George Bradley* v. *Boston and Maine Railroad,* 2 Cushing's R. 539.

All the testimony shows that the agents knew * of Judge Bailey's habit of being busily engaged in the prosecution of his work in shipping cotton and loading cars; they knew when the up-train was coming; they knew they were coming on his siding; he could not have known it; they should have certified themselves of his being present or not—and finding him present, should have warned him *by a messenger, or have approached in manner that there could have been no peril to him from their act.* Judge Bailey had his lantern burning in his hand; they could have seen him; they were there by courtesy, to say the most for them—he by contract, by right paramount.

. 7. The tenth and last instruction for the plaintiff, that if Hewson was on the Bailey siding without authority, but with defendants' engine, and in defendants' employ, or having authority to go there, did not use due care and caution—that in either case plaintiff is entitled to recover; this instruction was given by the court, and contains the law *now* so clearly settled, that an argument for or against the proposition "would be vain and ridiculous excess." 31 Miss. R. (2 George), 198, 196; *Philadelphia and Reading Railroad* v. *Derby*, 14 How. U. S. R., pages 468, 479, 480, 485, 486; *Mayer & Co.* v. *McLure*, 36 Miss. R. (7 George), 403.

II. The counsel for defendants endeavored, in their sixth instruction asked by them and refused by the court, to get the court to rule the law as laid down in the ordinary transactions of masters and servants other than railroad companies using steam-power, and their servants, to wit: " that the master is not

* Knowledge or other attribute of the mind is to be inferred by the jury *from* facts and *circumstances. Exeim* v. *Brister,* 6 George, 398, 394; *McCoy* v. *McKeown,* 4 Cushm., page 491.

liable for the trespass of his servants." 1 East, 106; *McCoy* v. *McKeown*, 4 Cushman, 487.

The counsel might have made the proposition more glaring, according to the books, "for the wilful trespass" of his servant (Ib. and Angel on Carriers, section 604), and yet, had their refused sixth instruction *been* so worded, the court below would have done right to refuse defendants' said instruction. This court, on the maturest deliberation, having fairly argued out, *in extenso*, the law on this subject, first by Judge Handy in 2d George, 196, 198, then by Judge Harris in 38 Miss. R., *N. O., J. & G. N. R. R. Co.* v. *Albritton*, 9 George, 275–278, left the court below no alternative, either in reason or authority, but to exclaim in the language of the hymn: "A charge to keep I have."

Judge Harris, particularly, following the paths made luminous by the court in 2 George and in 14 Howard's U. S. Reports, meets the proposition contended for in defendants' sixth instruction, and shows by the clearest reasoning that the cases which sustain it have no application to the relations between master and servant, when *a railroad is master, and his agent the servant,* but that as to "the new modes of travel invented by the age" (9 George, 278), the propellers by steam are responsible for "the wilful trespass" of the agent as well as for his negligence, and that "on the grounds of public policy, convenience, and necessity" this must be so, "to meet the enhanced facilities, dangers, and necessities growing out of the use of the new modes of travel," above referred to. 9 George, 274–278, 38 Miss. R.

2. As to the other instructions asked by defendants, they are mostly abstract propositions, "not predicated upon" or "not growing out of the evidence in the cause." *Lewis* v. *Black*, 5 Cushm. 434, 435, 436; *Heirn* v. *McCaughn et ux.*, 3 George, 47, 48.

The modification of the seventh and last instruction asked by defendants needs no authority.

As to the instructions given for the defendants where they are not abstractions or predicated upon evidence, *they left* the question of negligence to the jury.

This is a motion for a new trial. It is not for defendants *to complain that* THEIR *instructions* were given; they cannot assign the giving of their own *instructions as error ;* we do not *as to this present argument* complain that they were given; THEY left the question of negligence and of fault to the jury; the jury have found that there was negligence in defendants, and that Judge Bailey was without fault.

There was evidence *conducing* to sustain that view. 2 George, 198; 3 George, 51; 6 How. Miss. R. 222; 3 Ib. 221, 222. Under such circumstances, so far as the motion for new trial goes, " the finding of the jury *settles the fact,*" and the Court of Appeals will not disturb their verdict. *Vicksburg and Jackson R. R. Co.* v. *Patton,* 2 George, 197, 198; *Heirn* v. *McCaughn et ux.,* 3 George, 51.

3. On motion for new trial, the Court of Appeals will not disturb the judgment because instructions were refused that ought to have been given. 7 How. Miss. 338. *Wiggins* v. *McGimpsey,* 13 S. & M. R., page 540. Or because instructions were given that ought to have been refused. 12 S. & M. 672 ; 1 S. & M. 411. When the jury found according to law and facts (Ib.), or preponderance of evidence. 13 S. & M. 406, 605. Unless it is *clear* that justice *has not* been done. 7 How. 338 ; *Borh* v. *Steamboat Baton Rouge,* 7 S. &. M. R., page 723. *Or,* unless by the granting of the new trial, a different result could, *or* clearly ought to be produced. *Pritchard* v. *Myers,* 11 S. &. M. 178 ; *Baynton et ux.* v. *Finnell,* 4 S. & M. 201, 202 ; *Wiggins* v. *McGimpsey,* 13 S. & M. 540 ; *Borh* v. *Steamboat,* quoted above, 7 S. & M. 723. The deduction is that the verdict *must be shown* to the Court of Appeals on the whole record to be " manifestly wrong." *Ward* v. *Kirkman,* 13 S. & M. 605.

III. In vain it may be said that Judge Bailey was in fault. The jury have found that he was not in fault, on instructions asked by defendant submitting that question to them for trial; and it is well held that there could be no fault in a man's falling into a wrong place, or to a wrong direction, if he acted from natural instincts or fears, produced by the peril brought on by

29

the want of care and caution, or fault or negligence of defendants, or any of their agents. *Stokes* v. *Saltonstall*, 13 Peters' R. 182, 183, 185, 186, 191; *Phila. and Reading R. R. Co.* v. *Derby*, 14 How. U. S. R., page 469.

2. In vain it may be said that the New Orleans Company had a right to be there by their agent and engine, through courtesy or contract. A man may have a right of way over his neighbor's land for his wagon, or may be allowed to turn out of the road on his neighbor's land, by courtesy or sufferance; still, he must use the right, courtesy, or permission with due care, and free from negligence, as he would want to be dealt with; he must not destroy his neighbor's children, or run *over him* while his back is turned, intent on his lawful affairs, and on his own ground.

3. In vain it may be said that the agent, Hewston, had to crush or be crushed, that he had no other alternative; but this does not excuse the railroad company; there was a plenty of ground *for them* to make more room, or more tracks; and all their caution or prudence in selecting proper agents and in giving proper instructions *will avail nothing* if they furnished or provided such scant tracks, or outlets, or sidings, or whatever they may be called, that the tortious act of their agent was the natural consequence of such want of tracks or sidings.

The rule is thus stated by Angell: " Where the trespass *is the natural consequence* of the act directed by the master to be done by the servant, the master is liable, although his direction to the servant *is to avoid* the trespass." Angell on Carriers, section 604, last of it.

Judge Bailey was leaning over, loading his car, surrounded by darkness and by a *babel of sounds*. In using their courtesy (for that is the extent of their testimony on that point—the fullest extent) they should have made provision for another outlet *under* just such circumstances, he being there by right, and intent on his lawful calling and business.

4. There was no point taken below for a new trial, on the ground of excessive damages, as the court will see, from looking at the causes set down for the new trial, in the motion made

to the court below by defendants. The damages were evidently far less than plaintiff had a right to expect.

HARRIS, J., delivered the opinion of the court.

Defendant in error brought his action in the Circuit Court of Madison county to recover of the plaintiffs in error damages for the alleged misconduct and negligence of their agent, in causing a collision of the cars on the side track of the Central Railroad, at Canton, thereby throwing defendant from a freight car on which he was standing, attending to the loading of some cars, lawfully on said track, and causing great bodily injury and pecuniary loss to defendant in error.

To this complaint the plaintiff in error filed a general denial, and there was issued thereon a verdict for the plaintiff below.

A motion was made for a new trial and refused, and bill of exceptions taken, in which all the testimony and all the instructions given and refused, or modified, are embraced, and the cause brought to this court by writ of error.

The errors relied on for reversal here, are, that the court erred in granting instructions for the plaintiff below; "in refusing two of defendants' instructions;" in modifying defendants' sixth instruction, and that the damages are excessive.

The arguments of counsel for plaintiff in error, furnish us the specific grounds of error on which they ask a reversal of this case, and the first is, that the court erred in instructing the jury that if they find for the plaintiff, they may give punitive damages, to operate by way of example, and to deter others from similar acts of violence and oppression, if any such acts were committed.

It is insisted, that while the railroad is liable to make *compensation* for the injuries committed by their agents in the transaction of the business of the company, that no adjudicated case can be found, nor any well-considered *dictum* produced, which will hold the principal responsible in *vindictive or exemplary damages*, for the misconduct of the agent, unless that misconduct was either approved or ratified by the princi-

452    HIGH COURT OF ERRORS AND APPEALS.

New Orleans, Jackson, and Great Northern R. R. Co. v. Bailey.

pal, or had its origin in some wrongful act or negligence of the *principal himself.*

The zeal, ability, and ingenuity with which this point is pressed upon us, has induced us again to look into some of the authorities—elementary writers, as well as adjudicated cases in our own, as well as other courts—upon this subject, and we are constrained to say, that whether upon principle, or authority of adjudged cases, no general rule seems to be more firmly established, than that which holds that the principal is *civilly* responsible in damages for the acts of his agents, whether negligent or wilful, done in his employment, to the same extent as if the *principal himself* were the actual wrong-doer. That there are many instances in which courts, yielding to the hardships of particular cases, have faltered in its application, affords no just grounds for disputing the validity of the rule itself.

To subject the maxims or fundamental principles of legal science to the test of judicial decisions, instead of bringing adjudged cases to the test of these principles, would unsettle the basis of our whole system of jurisprudence.

What is the *principle* upon which this rule of damages is founded? It is that the act of the agent is the act of the principal himself—*qui facit per alium, facit per se*—as expressed in the Roman law, and adopted into our law as a maxim. The original reason for this principle, both in the civil and common law, was, that the agent is but the instrument; that he who employs and confides in another, for his own benefit, must be the loser, rather than a stranger; that he, in effect, *warrants* the fidelity, good conduct, and skill of his agent in the business of his agency, and affords him the means of committing the injury; and therefore, on grounds of public policy, public convenience, and utility, as well as public safety, the law has established, to this extent, their legal unity and identity. Lord Holt says, in *Coggs* v. *Bernard*, 2 Ld. Raymond, 909, "that it is a politic establishment, contrived by the policy of the law for the safety of all persons, the necessity of whose affairs obliges them to trust these sorts of persons." Sir William Blackstone, in his Com-

mentaries, volume 1, page 431, in concluding his chapter "Of Master and Servant," on the subject of the liability of the master for the acts of his servant, says, "that the master may be frequently the loser by the trust reposed in his servant, but never can be a gainer; he may frequently be answerable for his servant's misbehavior, *but never can shelter himself from punishment by laying the blame on his agent.* The reason of this is still uniform and the same: *that the wrong done by the servant is looked upon in law as the wrong of the master himself;* and it is a standing maxim, that no man shall be allowed to take any advantage of his own wrong." This legal unity of the principal and agent, in respect to the wrongful or tortious, as well as the rightful acts of the agent, done in the course of his employment, is an incident which the law has wisely attached to the relation, from its earliest history.

It is as thoroughly engrafted on the relation of principal and agent, and is an incident as inseparable from it in our law, as the rule that husband and wife are one person in law. They are both legal assumptions or fictions, and yet upon this principle, of the union in person of husband and wife, depend all the legal rights, duties, and disabilities that either of them acquire or incur by the marriage relation. Out of this same unity of person, established by law, arises the liability of the husband, jointly with his wife, for her tortious acts or misconduct during the existence of that relation. Just as well, therefore, might the husband claim exemption from his legal responsibility for the acts of the wife, upon the ground of his innocence, and inveigh against the cruelty and tyranny of courts for holding him to his legal duty and responsibility to third persons, arising from the voluntary creation of that relation, as can the plaintiffs in error in this case claim a like exemption. To transact their business by agents is an indulgence the law extends to the plaintiffs in error for their benefit, but subject to the responsibilities and incidents it has attached to the principal in that relation. When, therefore, they contracted this relation, they voluntarily engaged with the public and third persons, that the act of their agent in the course of their business, *should* be

regarded as their act in law, and they responsible accordingly. In *Travis* v. *Claiborne*, 5 Munf. R., page 435, Judge Roane says: "The reason why the acts of the agent are in many respects considered as the acts of the principal, arises from the relation between them; and as the liberty of acting by an agent is an indulgence to the principal, it is reasonable he should be bound by the acts of his agent, done in pursuance of the authority given him. In such case the *act of the agent is the act of the principal*, and no action is imposed upon the latter, but by himself, through his agent, acting under his authority. No injury is done to third persons by this construction; they are in the same situation as if this indulgence had not been granted the principal, and he had been compellable personally to do the act."

Mr. Holt in his Nisi Prius R., pages 227, 229, has appended a very able note on this subject, cited with great approbation by Judge Story in his work on Agency, page 614, section 454. He says: "The responsibility of the master for the acts of his servant has been extended by recent cases to a length beyond the ordinary course of practice, and which, unless the principle be duly understood, may appear contrary to reason and the principles of general equity. The question is of very general concern, and the cases rest upon some nice distinctions, which, however subtle and remote, are perfectly consonant with the principles of legal liability—a very different thing from moral criminality."

The foundation of this branch of our law is avowedly in the maxim of the Roman code (4 Just. title 5), *qui facit per alium, facit per se*, namely, that the agency of a servant is but an instrument; and that any man having authority over the actions of another, who either expressly commands him to do an act, or puts him in a condition of which such an act is a result, or by the absence of a due care and control (either previously in the choice of his servant, or immediately in the act itself), negligently suffers him to do an injury, shall be responsible for the act of his servant, *as if it were the act of himself*. All the cases rest upon the development of this principle.

"In all such cases the term in the law books, '*general command*,' is equivalent to the words, *general deputation*, or *volun-*

*tary substitution* of the servant for the master within the line of his particular employ, and, therefore, *all the acts of the servant, within* such particular line, are very properly regarded *as the acts of the master.*"

Judge Story, in treating of the liability of principals to third persons for the acts of their agents, gives the origin of the rule, thus : " The whole doctrine turns upon the obvious maxim, that he who acts by another, acts himself," quoting the maxim of the Roman law.  He says : " It is a general doctrine of law, that although the principal is not ordinarily liable (for he sometimes is) in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has authorized or coöperated in those acts or misdeeds ; yet, he is held liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances, and omissions of duty, of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed know of such misconduct, *or even if he forbade the acts, or disapproved them ;*" and for this he cites numerous authorities.  " In all such cases," says he, " the rule applies *respondeat superior ;* and it is founded upon public policy and convenience ; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents.

" In every such case, the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, *he warrants* his fidelity and good conduct in all matters within the scope of his agency."

In section 458, page 634, Judge Story, treating of the responsibility of owners and employers of ships, and of stable-keepers, by the Roman law, and the reason for it, says, " they are responsible for the tort and fraud of their agents and servants, although they are not parties to it, *quasi malificio, as if they themselves were wrong-doers ;* because they have made use of the service of such bad agents and servants in their employment."  And yet he says that " the Roman law does not seem to have recognized to the full extent the general maxim, *respondeat superior,*

inculcated by our law " (section 460).    He further adds that the modern nations of continental Europe have adopted the doctrine of the Roman law on this subject to its full extent, and some of them, at least, seem to have carried it much further (section 461).

· In England, an attorney was held answerable for a trespass committed by his agent, in suing out an execution after payment by the judgment-debtor, though it was done without his knowledge, and upon the reason that " *the attorney and the agent are to be considered one person.*"    *Per* Abbot, C. J., in *Bales* v. *Pillings,* 6 B. & C., page 38.

If then the act of the agent be the act of the principal in law, and this legal identity is the foundation of the responsibility of the principal, there can be no escape from his indemnity to the full extent of civil responsibility, whether we regard it as the result of the technical rule, or on the broader basis of general propriety, utility, and convenience.

If the principal seeks the indulgence of using faithless agents for his own advantage, he must take it *cum onere ;* subject to the rights of the public, to insist on this same legal identity, as though the principal had acted for himself.    If he has delegated dangerous powers to unworthy agents, it is his fault, or his misfortune ; and no matter which, he cannot be permitted to throw the one or the other upon those who are compelled by his act " to trust these sorts of persons."

It is urged that railroad corporations, having a large amount of business, can only act by agents, who are numerous ; and " that some of them will prove negligent and abuse their trusts, is positively certain, for they are human," and to hold their principal to this responsibility for their acts, would be to inflict punishment, not for his wrong, but because of his inability to do an impossible thing ; that such a rule would wither all enterprise, deter capitalists, encourage speculative litigation, destructive alike to public morals and the commercial prosperity of the State.

If it be " positively certain" that somebody *must* suffer from the wrongful acts or negligence of these employees, as is here urged, and that without the positive fault of their principals,

upon whom should the calamity fall—upon him who trusted the wrong-doer for his own gain, or on the stranger? If idle capital in search of splendid investment, must do its work by agents, who "*it is positively certain*" will prove negligent or abuse their trust, upon what principle of legal right or ethical rule can it demand of the public to bear the wrongs and injuries it originates, or to change or modify the legal incidents annexed upon grounds of public policy and public safety, to the relation it has voluntarily assumed? If in law their civil unity and identity with their agents, in all their acts done in the course of their agency, is a necessary incident of that relation, these corporations, which are never headless, are presumed to know it; and with a knowledge of its legal consequences, can they, with any claim of justice or right, ask to be absolved from the incidents which the law has attached to the relation of prinpal and agent, for the public safety, against the very evils and dangers which it is here urged are inseparable from that relation? If they *must* introduce or engage in a business, in the prosecution of which the personal security and even the personal liberty of the citizen *must* or may be violated or invaded, they are aware of their responsibility, in presumption of law, and are, doubtless, paid accordingly. Is it, then, reasonable to demand that they shall rest in comfort and security in the enjoyment of the large profits they realize from the dangerous instrumentalities they set in motion while the public shall suffer, without adequate protection or redress, under the outrages, indignities, and insults inflicted by irresponsible, cheap agents, commissioned by them with the power and opportunity, if not the will, thus to act? Nay more—shall this be done *because* " it is positively certain " that some of their agents *will* prove negligent, and abuse their trust?

We shall not attempt a review of the many and irreconcilable cases on this subject which are to be found in the books; this would require a volume; but we have only designed to show the origin and reason of the rule, and the principle by which these cases are to be tested. We are satisfied, that whether we consider the question upon strict technical, legal

rules, or upon the great principles of moral right and social duty which generally lie at their foundation, this *civil* responsibility for the wrongful or wilful act of an agent in the course of his employment must rest upon the principal to the same extent as if he had committed the act himself; and to this extent, and resting on this foundation, are all the cases decided in this court.

It is next insisted, that the fifth and sixth instructions for plaintiff below are erroneous.   These instructions are as follows:

"Fifth.  If the jury believe from the evidence that the plaintiff was injured by defendants' agents in the course of their employ, then the jury will have to be satisfied from the evidence that said agents were not only skilful and of good habits, but that they acted on the occasion with reasonable skill, and with the utmost prudence and caution ; and if the jury believe that the disaster was occasioned by the least negligence or want of skill or prudence on the part of the defendants or their agents, or either of them, then the law is for the plaintiff, and the jury will so find.

"Sixth.  If the jury believe from the evidence that the defendants are a railroad company, acting in their transportations by the dangerous and powerful agency of steam, public policy and safety require that they be held to the greatest possible care and diligence, and any negligence in such cases may well deserve the epithet of gross."

It is not denied that the rule laid down in these instructions, as applicable to passengers, is correctly stated; but it is urged, that as to third persons, not passengers, or others, towards whom the company is under no special obligation of extreme diligence, the rule of law is, that the company is only responsible for injuries arising from the want of *ordinary* care and skill, and that this is the rule applicable in this case.

Mr. Pierce, in his work on American Railroad Law, states the rule as held by Mr. J. Willard, in *Brand* v. *Schenectady and Troy R. R.*, 8 Barb., pages 368, 379 :   "The highest diligence is not to be exacted of any person, except when a compensation is paid for the service; or where the party injured is in the power, or under the control of the defendant, as in case of stage pas-

sengers; or the party officiously obtrudes" his services upon another, or is the sole party deriving a benefit from the act; or that the party occasioning the injury was in the wrong place, or engaged in an unlawful calling; but where both parties stand on an equality as to the means of avoiding the accident, and both are engaged in a lawful employment, only ordinary diligence will be required.

The rule as thus stated is not inconsistent with the general rule recognized by this court in the *Jackson and Vicksburg Railroad Co.* v. *Patton*, 31 Miss. R. 156, based upon the decisions of the Supreme Court of the United States in 13 and 14 Peters: "That where carriers undertake to carry passengers by the powerful and dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence;" and "that persons having charge of instruments of great danger, are bound to manage them with the utmost care." The decision of J. Willard, quoted by Mr. Pierce, was in the case of a foot passenger who was injured while walking on the track of a railroad in the streets of a city; and it was there held, that in the case of passengers, or when the party injured is in the power and under the control of the carrier, or when the party officiously obtrudes his services upon another, or is the sole party deriving benefit from the act; or when the party occasioning the injury was in the wrong place, or engaged in an unlawful calling; in all such cases the general rule exacting the utmost or highest diligence is applicable. But in the absence of such circumstances, "when both parties stand on an equality as to the means of avoiding the accident, and both are engaged in a lawful employment, the strict rule of extreme diligence is not required of the carrier," and this is the rule stated by this court, as applicable to the case of the *Mississippi Central Railroad* v. *Miller*, not yet reported, to which the general rule of extreme diligence is held inapplicable.

The case before us does not fall under the rule last stated, as is here urged by counsel for plaintiffs in error. This was not a case where both parties stood on an equality *as to the means*

*of avoiding the accident.* For the defendant in error had no power to avoid the collision—he had no right to expect it—and no duty therefore devolved upon him. He had no right to suppose that the plaintiffs in error, either by negligence or design, would produce the collision. Plaintiffs in error had no right to occupy any portion of the siding, to the prejudice of defendant, but were there by courtesy, and *"for their own benefit,"* attempting to occupy a place not belonging to their company, and in the actual prior occupancy of one lawfully entitled thereto, by contract with the owners for a valuable consideration—a right in its nature exclusive. Of this actual occupation, under the circumstances, they were bound to take notice, at their peril. When leaving their own track, with a powerful and dangerous engine, to occupy a track belonging to others, it was their duty to know, and, if ignorant, to inform themselves, of its situation, whether occupied or not, so as to enable them to avoid all accidents. There was, therefore, no " equality in the means of avoiding the accident "—no equality in power— no equality in right—no equality in duty. The means, the power, and the duty of avoiding the accident all rested on the plaintiffs in error.

The act of the plaintiffs in error, which produced the collision, was an unlawful act, a trespass, and without necessity. Their " courtesy " only extended to the use of that track (as testified to by Frost, the superintendent of the Miss. Central R. R.), *when nothing was in the way,* and under this permissive use, they had no right to infringe upon the lawful occupancy of defendant in error. They were " *the sole parties to be benefited by the act,*" and they alone were called upon, according to the circumstances in evidence, to exercise any diligence in avoiding the collision, and those circumstances demonstrate the necessity of the utmost caution and greatest diligence. The rule in relation to foot passengers walking on the track of a railroad, or others crossing railroads at the intersection of public highways, or in the streets of a city, with power of locomotion, and under a duty not to obstruct the passage of cars, can have no application to a case like this. In all such cases the party injured

voluntarily places himself in the way of the company's right, and where they are not only accustomed to run their engines, but *of necessity must run them*. But here the plaintiffs in error " *were in the wrong place*," having no right to occupy the place where defendant stood, having no necessity to run their engines where defendant's cars were standing, and not accustomed to run them there when " *anything was in the way*," or when previously occupied.

The fifth and sixth instructions were therefore properly given.

The next error complained of is the ninth instruction given for plaintiff below, as follows:

" Ninth. That it was not sufficient for the defendants to have given the usual warning; even if the jury should be satisfied that they did give the usual warning, yet if their agents, or either of them, did not give all the warning and use all the caution that the nature of plaintiff's position, the time of night, and the locality required, the defendants are responsible in damages for all injury done to plaintiff, for want of such reasonable caution and warning that the nature of the case, time of night, and locality required."

This instruction was certainly not to the prejudice of plaintiffs in error, for no warning that they could have given would have been sufficient, in a case like the present, to relieve them from responsibility for a collision; though the jury were left so to infer from this instruction. If the plaintiffs had given actual personal notice of their moving on this side track, or even further, that they *intended* to run their engine against the cars on which defendant was placing his cotton, it will scarcely be assumed that even this would have justified their act, or excused them from liability, or impose any legal duty on defendant in error. The blowing of their whistle, the ringing of their bell, the shouting of their agents, or the presence of their side-lights, or any other demonstration they could have made, could only have amounted to notice to the defendant in error that they were moving on the side track so far, and no farther, as they lawfully might, without prejudice to the defendant in error, and that with the utmost caution and prudence; and not that they

designed or expected a collision. The defendant in error could not, therefore, have been required to do anything. This permissive use was in subordination to the right of defendant in error. There was ample room for both. Defendant in error had no right, therefore, to expect, and was under no obligation to use any diligence to prevent, a collision, or any accident that might result from it; while plaintiffs in error were under every obligation to see that no one suffered injury by an act which was alone for their benefit, and of which no one in the situation of defendant in error could have been reasonably expected to take notice. Defendant in error was bound to do nothing, for he had no power to avoid the collision. Plaintiffs in error were bound to all care and diligence, because they had the power to prevent it; and the proof clearly shows they are without the shadow of excuse. The pretence that their brakesmen and agents in charge of the engine, with only " twenty pounds of steam," " moving *very slowly*," could not with perfect care have controlled it, as set up by their guilty agent, Hewston, in his deposition, is preposterous, and only affords additional proof of the unreliable character of this source of evidence.

Notwithstanding any warning or notice the plaintiffs in error might have given, they were bound to the utmost diligence, and there was nothing, therefore, to their prejudice in this instruction, which left it to the jury to say whether, under all the circumstances in evidence, the plaintiffs in error had used the utmost diligence to avoid the collision.

We think there was no error in the tenth instruction. Nor do we think there was any error in refusing the motion for a new trial.

Let the judgment be affirmed.